UNITED STATES of America

v.

John F. CRYAN, Harry Lerner, William J. Leonardis, and Rocco Neri.

Crim. No. 79–289.

United States District Court, D. New Jersey.

May 22, 1980.

---

Robert J. Del Tufo, U. S. Atty. by Peter B. Bennett and Robert Goodman, Asst. U. S. Attys., Newark, N. J., for the U. S.

Raymond A. Brown, Henry F. Furst, Brown & Brown, Jersey City, N. J., for defendant Cryan.

Kenneth J. McGuire, Stein, Bliablias & McGuire, Newark, N. J., for defendant Harry Lerner.

Gerald Krovatin, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N. J., for defendant Leonardis.

Alfred C. DeCotiis, Newark, N. J., for defendant Neri.

## OPINION

STERN, District Judge.

In this action the Court must decide whether the Racketeer Influenced and Corrupt Organizations Act (RICO), Title 18 United States Code §§ 1961 *et seq.*, changes the substantive law of conspiracy so that individuals may be charged with each other's actions merely because they are employees of a single governmental unit. The Court holds that RICO does not permit such an imputation of criminal liability.

## I. FACTS AND PROCEDURAL HISTORY

On August 23, 1979, a Federal Grand Jury returned an Indictment charging John F. Cryan, Harry Lerner, William J. Leonardis, and Rocco Neri with racketeering activities in connection with the Sheriff's Office of Essex County, New Jersey.[1] The Indictment charges that defendants Cryan, Leonardis and Neri, high-ranking officials in the Sheriff's Office,[2] and defendant Lerner, former Chairman of the Democratic Party of Essex County,[3] used the power and color of their office to extort money from Sheriff's Office employees.

The first two counts of the five-count Indictment charge all the defendants with violating provisions of RICO. Count One charges that from about November 1970 through May 1978, the defendants conspired

---

1. The duties and powers of the Sheriff include "the detection, apprehension, arrest and conviction of offenders against the law," N.J.Rev. Stat. § 2A:154-3, custody and control of the county jails and all prisoners therein, N.J.Rev. Stat. § 30:8 17, and the supervision of court attendants, N.J.Rev.Stat. §§ 2A:11 -32 and 35.

2. Cryan was elected to a three-year term as Sheriff of Essex County in November 1970 and was reelected in 1973 and 1976. Leonardis

began working in the Sheriff's Office in December 1971 as a court attendant, and was appointed Chief Inspector, the third highest position in the Sheriff's Office, in May 1972. Defendant Neri first entered the office in 1975 when he was appointed Undersheriff, the position directly beneath Sheriff.

3. Lerner served as County Chairman from February 1968 until his retirement in April 1978.

to conduct the affairs of an enterprise, the Essex County Sheriff's Office, through a pattern of bribery and extortion, in violation of Title 18 United States Code § 1962(d). Specifically, it charges that the defendants conspired "to create and perpetuate the understanding by employees of the Sheriff's Office that annual cash payments, in the guise of political 'contributions' and 'donations' of approximately one percent of an employee's salary and since in or about 1972 at least $100, were a condition of their employment, retention of duty assignments and other employment-related benefits."[4] Count Two charges the defendants with violating one of the substantive provisions of RICO, Title 18 United States Code § 1962(c).[5] It charges that between December 1970 and May 1978, the defendants committed 221 acts of bribery and extortion by soliciting and receiving payments from Sheriff's Office employees of between $50 and $500. The remaining three counts charge defendant Lerner with committing perjury in December 1978 before a grand jury investigating possible corruption in the Sheriff's Office.

Trial commenced on January 7, 1980. The government, in its opening statement, alleged a long-standing conspiracy among members of the Sheriff's Office to accept annual payments from employees as a condition for receiving salary increases, preferred job assignments, promotions, and other benefits. Although the government stated that it had no evidence that the defendants were part of the conspiracy prior to November 1970, the government claimed that it would prove that the scheme originated as early as 1947. The practice continued, the government contended, from administration to administration, and its primary beneficiary at any given time was the county chairman of whichever political party was in power. These county chairmen, the government asserted, controlled the nomination process within their parties; that is, they chose the candidates who would thereafter compete in the general election, including the candidates for Sheriff and the candidates for the Board of Chosen Freeholders, Essex County's legislative body.[6]

The government asserted that defendant Lerner maintained an illegal and unreported cash "slush fund" which he used for campaign purposes, legal and illegal, as well as for personal expenditures. This "slush fund" allegedly consisted of cash collected from the heads of all county departments, including the Sheriff's Office. Once a year, the government alleged, usually in November, each Sheriff's Office employee would place cash in an envelope, in an amount equal to one percent of his or her salary, and give the envelope to one of the named defendants or to an unnamed co-conspirator. The majority of this money, the government asserted, was given to Lerner and deposited in the "slush fund."

The government further alleged that in January 1971, members of one division within the Sheriff's Office, the Identification Bureau, made payments to defendant Lerner in return for Lerner's attempts to influence the Board of Freeholders to grant them a salary increase. These payments, collectively referred to as the "Lerner

---

4. Count One of the Indictment, ¶ 11.

5. Title 18 United States Code § 1962(c):

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"Racketeering activity" as defined in the statute includes any act or threat involving bribery or extortion chargeable under state law and punishable by imprisonment for more than one year. The Indictment charges that the defendants violated N.J.Rev.Stat. § 2A:105-1 (extortion) and § 2A:93-6 (bribery). A "pattern of racketeering activity" requires:

at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity. Title 18 United States Code § 1961(5).

6. See N.J.Rev.Stat. § 40:20-1.

transaction," are charged in both Counts One and Two.[7]

The government's first two witnesses testified that the alleged scheme was in effect prior to the time covered by the Indictment. Alfred Scriffignano, a former court attendant, testified that between 1959 and 1967 he made annual political contributions with the understanding that such contributions were required to obtain preferred assignments. Otto Eschenroeder, a former process server, testified to transactions occurring as early as 1947. Defendants objected to all testimony concerning transactions prior to 1970. The Court permitted Scriffignano's testimony for the limited purpose of giving the jury background information about the "system" which the government contended the defendants had continued, but ordered Eschenroeder's testimony stricken. A third witness, Anna Santos, testified to a "common understanding" among Sheriff's Office employees that receiving preferred job assignments was conditioned upon making political contributions, but she did not link this understanding to any of the defendants. The Court permitted Santos' testimony subject to later connection to the defendants.

The government then called Wilbur Furlong, an officer in the Identification Bureau who was named by the grand jury as an unindicted co-conspirator, to testify concerning the "Lerner transaction." Furlong testified that in the fall of 1970—before any of the defendants were employed by the Sheriff's Office—the Board of Chosen Freeholders denied the Identification Bureau employees a raise while granting one to other employees in the Sheriff's Office. Furlong further testified that in January 1971, several weeks after Cryan assumed office, he, Furlong, suggested that each of the approximately 20 Identification Bureau

employees contribute $200 to defendant Lerner, who they hoped would persuade the Board of Freeholders to grant them a salary increase. Furlong conceived of this scheme, he said, after having recalled that some years earlier a similar impasse had been broken by a contribution/payment to the then-County Chairman, Dennis Carey. Furlong collected the money, even advancing cash to those employees who did not have it readily available, and with one other employee, gave the approximately $4,000 to Lerner.

■ Defendants objected to the introduction of this testimony. The Court permitted it but, at the defense's request and with the government's consent, instructed the jury that the testimony could not be used substantively against Leonardis or Neri. The Court denied defendant Cryan's request for a similar limiting instruction based upon the government's representation that it would introduce independent evidence to connect Cryan to the transaction. When the government subsequently concluded that it would not be able to introduce such evidence, or even to show that Cryan knew of this collection and payment, defendants moved to dismiss the Indictment or alternatively for a mistrial. The Court held that evidence of the "Lerner transaction" was admissible, if at all, only against Lerner. It further held that a limiting instruction would not be sufficient to cure the prejudicial impact of the evidence. *See United States v. Continental Group, Inc.*, 603 F.2d 444, 456 (3rd Cir. 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). Accordingly, the Court granted defendants' motion for a mistrial. Defendants' motion to dismiss the Indictment, brought solely on the ground that the government had engaged in misconduct, was denied.

---

7. Count One of the Indictment charges, in addition to an illegal agreement, 36 overt acts committed in furtherance of that agreement. Two of the overt acts are part of the "Lerner transaction:"

2. In or about January, 1971, the defendant, HARRY LERNER, had a conversation with Wilbur B. Furlong and Maurice Friedlander, employees of the Sheriff's Office, at the Essex County Democratic Party headquarters.

3. In or about January, 1971, the defendant, HARRY LERNER, received approximately $4,000 in cash from Wilbur B. Furlong.

Count Two charges the defendants with eighteen $200 payments received by Lerner from members of the Identification Bureau.

The government now moves *in limine* for rulings on the admissibility of certain evidence, including evidence of the "Lerner transaction." Defendants oppose the motion and cross-move to dismiss the Indictment, contending that Counts One and Two are defective as a matter of law because of the inclusion of the "Lerner transaction" in these counts.[8]

## II. SUFFICIENCY OF THE INDICTMENT

■ An indictment may not charge multiple conspiracies in a single count. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Kenny*, 462 F.2d 1205, 1216 (3rd Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). The rationale for this principle is two-fold. First, a jury verdict on any count which charges two separate offenses is ambiguous: it does not reveal whether the jury considered and reached a verdict on each offense charged. *See United States v. Starks*, 515 F.2d 112, 116–17 (3rd Cir. 1975). Second, a count charging two offenses does not reveal whether the grand jury intended to charge both offenses, or whether it would have charged either had it been aware that the offenses were distinct. This problem is particularly acute when the multiple offenses charged are conspiracies, because the grand jury may have indicted one defendant on the basis of evidence admissible only against other defendants. *See Kotteakos v. United States, supra*, 328 U.S. at 769–70, 66 S.Ct. at 1250.

Defendants contend that Count One is defective as a matter of law because it does not charge a single conspiracy among the defendants, but in fact charges at least two separate conspiracies among entirely different groups of people: first, a conspiracy between defendant Lerner and members of the Identification Bureau to influence the awarding of a salary increase by the Board of Chosen Freeholders; and second, a conspiracy among all the defendants and others to create and perpetuate a system to extort annual political contributions from all of the Sheriff's Office employees. Defendants also challenge the sufficiency of Count Two, which substantively charges all four defendants with the "Lerner transaction."

The government asserts that Count One charges a single conspiracy among all the defendants to conduct the affairs of the Sheriff's Office through a pattern of racketeering activity. The government argues that Lerner and others were parties to this conspiracy in November 1970, when the "Lerner transaction" was conceived, and that the other defendants later joined that conspiracy. Thus, the government contends, all the defendants may be charged with the "Lerner transaction" in both Counts One and Two even though Lerner was the only defendant who participated in or was even aware of it.[9] Alternatively, the government argues that conduct which under common law would constitute multiple conspiracies may be charged in one count under RICO. It posits that the defendants, having conspired to conduct the activities of the Sheriff's Office as an illegal enterprise, are responsible for all racketeering crimes committed in the office during their stewardship. In effect, the government contends that so long as multiple defendants are part of an agreement to conduct the affairs of the same "enterprise"

---

**8.** Defendants raise two other grounds for dismissal. First, they contend that the government intentionally proceeded on what it knew to be an erroneous legal theory, and that retrial on the same theory would constitute double jeopardy. The Court, however, finds no evidence that the government has not at all times acted in good faith. Second, defendants contend that the Indictment does not allege facts which would support a finding that the Essex County Sheriff's Office is engaged in, or has activities which affect, interstate commerce.

The Court finds that there is a sufficient nexus between the Sheriff's Office and interstate commerce alleged to support the finding of a RICO violation. *See United States v. Vignola*, 464 F.Supp. 1091, 1097–98 (E.D.Pa.), *aff'd mem.*, 605 F.2d 1199 (3rd Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980).

**9.** In fact, Leonardis and Neri were not even connected with the Sheriff's Office at the time.

illegally, they are members of the same conspiracy to violate RICO, even if their implementing activities are otherwise unrelated. The Court must reject these arguments.

■ The liability of a conspirator for the acts of a co-conspirator is not premised on the law of "conspiracy" but on principles of agency. Conspiracy is a crime, not a law of evidence. A conspiracy is a criminal agreement, express or implied, to commit one or more illegal acts. *See Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942). The law punishes the agreement because it does not deem it prudent to wait until the criminal plan has reached fruition.[10]

■ Co-conspirators, because they act pursuant to a common plan, are partners and, as such, each partner is both an agent of every other partner and a principal of the partnership. Under rules of agency, each partner is authorized to act within the scope of the partnership agreement, and every partner is responsible for all authorized acts. These rules do not derive from the "law of conspiracy" or the "law of crime" but rather from notions of vicarious responsibility. Thus, these rules apply equally in civil cases and in criminal cases in which no conspiracy is charged, as well as where the indictment formally charges conspiracy.

Rule 801(d)(2), Federal Rules of Evidence. *United States v. Cahalane*, 560 F.2d 601, 605 n.4 (3rd Cir. 1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *United States v. Pugliese*, 153 F.2d 497, 500 (2nd Cir. 1945) (L. Hand, J.).[11]

■ The Court determines the admissibility, against a defendant on trial, of what another has said or done out of court. Rule 104(a), Federal Rules of Evidence. The judge must decide whether he is satisfied, by a preponderance of the evidence, that an agency existed between that other and the defendant before the evidence may be admitted. He makes his determination from the evidence of agency produced before him, not from the nature of the accusation. The jury must determine whether to hold one defendant criminally responsible, and in a civil case, civilly liable, for what another has done—either because conspiracy and/or aiding and abetting is charged in the indictment or because the defendant is alleged to be a principal of the actor in the complaint.[12] In a criminal case, the jury must therefore determine whether there was a partnership, a partnership in crime, and this determination requires proof beyond a reasonable doubt.

It is clear that the functions of the judge and jury will coincide in a criminal case in

---

**10.** The crime of conspiracy is defined by statute. Under some statutes the government must prove, in addition to an illegal agreement, that at least one conspirator committed an overt act in furtherance of the agreement. *Compare* Title 18 United States Code § 371 (overt act express element of conspiracy) *with United States v. De Lazo*, 497 F.2d 1168, 1171 (3rd Cir. 1974) (overt act not element of conspiracy under Title 21 United States Code § 846).

**11.** Under Rule 801(d)(2), the following is not hearsay:
(C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The rules of admissibility of statements made in the course of a typical co-conspirator rela-

tionship would be the same even if subsection (E) were deleted. The basis of admitting all such acts and statements is that they have been authorized, expressly or impliedly, by the defendant.

**12.** The fact that imputation of responsibility rests on principles of agency rather than on a "law of conspiracy" is demonstrated by the statute which holds aiders, abettors, inducers, procurers and causers of criminal acts responsible to the same degree as the person who actually commits the act. Title 18 United States Code § 2:
(a) Whoever commits an offense against the United States or *aids, abets, counsels, commands, induces or procures* its commission, is punishable as a principal.
(b) Whoever willfully *causes* an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
(Emphasis added.)

which the indictment charges conspiracy or aiding and abetting and the government offers evidence against a defendant of acts which he has not personally committed. Although the burden of proof required to prove the elements of a particular criminal conspiracy is different from the burden of persuasion necessary to prove the admissibility of the statements of co-conspirators, the two tests overlap. The following example is instructive.

Suppose that A and B are indicted for bank robbery. A is charged with entering the bank; B is charged with being a lookout in the street. The indictment charges that A said to a bank teller: "Your money or your life." The judge must determine the *admissibility* of A's declaration into evidence against B. Under Rule 801(d)(2), Federal Rules of Evidence, the judge must decide whether the evidence shows that A was acting for B as well as himself. Once the evidence is admitted, the question of B's criminal responsibility for the bank robbery is decided by the jury. The jury looks to all of the proofs, including A's statement, and decides whether B has been proved guilty of the robbery beyond a reasonable doubt. Application of these principles is the same whether or not A and B have been charged with a conspiracy to commit bank robbery in addition to the bank robbery itself.

■ The jury, in determining the *responsibility* of B for the act of A, will be making the same kind of determination that the judge makes in determining the *admissibility* of the act of A against B. The determinations differ, however, in two respects. First, the judge determines admissibility by a preponderance of the evidence; the jury must determine guilt beyond a reasonable doubt. Second, the jury must determine responsibility based on *all* the evidence in the case, including challenged evidence admitted by the judge. The judge, on the other hand, under the present rule, must determine admissibility *without reference* to the proffered evidence. *United States v. Trowery*, 542 F.2d 623, 627 (3rd Cir. 1976),

cert. denied, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977); *United States v. Valencia*, 609 F.2d 603, 630–31 (2nd Cir. 1979); *United States v. Williams*, 604 F.2d 1102, 1113 (8th Cir. 1979); *United States v. Alvarez*, 584 F.2d 694, 698–99 (5th Cir. 1978); *United States v. Martorano*, 561 F.2d 406 (1st Cir. 1977), cert. denied, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978). This rule, limiting the discretion of the judge, apparently sprung from dicta in *Glasser v. United States*, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), and is based on the premise that hearsay cannot "bootstrap" itself into evidence. The agency of A and B cannot be established by the challenged evidence of what A is reported to have said; otherwise the statement would be its own authority for admission.

■ The superficial allure of this doctrine does not withstand analysis. First, if A speaks as the agent or partner of B, that statement is *not* hearsay. Under Rule 801, the statements of co-conspirators are not admitted as an exception to the hearsay rule but rather are not considered hearsay at all. Second, it is often impossible to prove the agency or partnership if the words of the declarant-agent are ignored. For example, suppose a child tells a storekeeper, "My mother has sent me for a pound of butter." She has sent the child in the past and always paid the bill. This time she does not. Without regard to what the child says to the storekeeper on this occasion, past contacts *alone* would not establish the agency on this particular occasion. The better rule is that, although the challenged statement *alone* cannot establish its admissibility against a non-declarant, that statement *along with* other evidence may establish its admissibility. There seems to be no reason to permit the jury to find agency beyond a reasonable doubt from all the facts, including the statement itself, but require the judge to disregard it in making the same determination by a preponderance.[12a]

---

**12a.** The Trowery doctrine is nowhere found in the Federal Rules of Evidence. In fact, Rule

104(a), which expressly permits the judge to consider otherwise inadmissible evidence in

Applying these principles to the evidence and the Indictment before us, we find that Counts One and Two of the Indictment improperly charge all four defendants with the "Lerner transaction." The government contends that responsibility for the "Lerner transaction" may be imputed to the three other defendants, who, the government alleges, later entered into a conspiracy with Lerner to violate RICO. The government argues that the Court should at least permit the jury to decide whether the "Lerner transaction" was part of the same conspiracy later joined by the other defendants.

In Count One, all the defendants are charged with an agreement to create and perpetuate a system under which the defendants solicited and accepted contributions from Sheriff's Office employees in return for job-related benefits. The agreement as alleged contemplated a highly organized system under which payments were expected on a regular basis,[13] and from employees in all parts of the Sheriff's Office.

The "Lerner transaction," in contrast, was confined to a single segment of the Sheriff's Office. The payments to Lerner were for the sole benefit of Lerner and the score or more men of the Identification Bureau who independently conceived and executed it. Moreover, it was not part of a regular scheme. The payments to Lerner,

the government alleges, were intended to serve a single purpose—to influence the approval of a wage increase for a select group of employees after months of bargaining and petitioning had failed. Once payment was made, or no later than when the pay increase was approved by the Board of Freeholders, everything allegedly contemplated by the parties had been achieved and the conspiracy terminated.

■ The government argues that the "Lerner transaction" was part of a broader conspiracy among the defendants and others to violate RICO. In effect, it argues that RICO was intended to impute the criminal liability of individuals to other individuals because they are employed by the same "enterprise."[14] This theory confuses two concepts: the substantive crime of conspiracy, and the imputation of criminal liability to co-conspirators based on principles of agency. RICO defines the elements of certain criminal conspiracies. It may not and does not change the fundamental principle that an individual may not be convicted on the basis of another person's acts which he neither authorized nor adopted. The government's attempted use of RICO in this case would change these fundamental concepts. Under the government's theory, once the jurisdictional prerequisites of RICO[15] are satisfied, all persons affiliated

making factual findings necessary to determine admissibility, may be read to repudiate implicitly this pre-Rules doctrine. *See* 1 Weinstein's Evidence ¶ 104[05].

**13.** The degree to which this scheme allegedly was organized is illustrated by Count One of the Indictment, ¶ 13, which charges that the defendants "prepared records of the systematic collection of cash . . . so that [they] could determine which employees had made such cash payments and [which] had failed to make such cash payments and that the defendants and co-conspirators would thereafter periodically destroy, discard or otherwise dispose of such records."

**14.** The government relies heavily upon *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), in which the Court of Appeals for the Fifth Circuit affirmed the convictions of a group of individuals who had formed an association solely to engage in criminal activities.

The court held that RICO was intended to supplant the "common object" rationale of conspiracy with the concept of "enterprise," and that the criminal association itself could constitute an "enterprise." *Elliott* is distinguishable from the instant case because the Indictment here alleges a pattern of racketeering activity in connection with an otherwise legitimate entity.

**15.** A "pattern of racketeering activity" requires two acts of racketeering activity, one committed after the effective date of the statute, October 15, 1970, and one committed within ten years of that act. Title 18 United States Code § 1961(5). An act of racketeering activity includes:

> any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year . . . .

with the same enterprise are bound together in a single conspiracy; provided that one racketeering act has been committed since 1970 and another no more than ten years before, RICO can be used to delve into the history of an otherwise legitimate entity to find patterns of racketeering from acts of wrongdoing committed decades ago.

The scope of the conspiracy charged in the Indictment is potentially enormous. The government contends that at the time of the "Lerner transaction" Furlong and Lerner were members of a conspiracy to conduct the affairs of the Sheriff's Office through a pattern of racketeering activity.[16] If the government's theory of RICO were correct, however, the actual conspiracy would in fact be much larger. If Furlong and Lerner were co-conspirators because they participated in the "Lerner transaction," the other 19 members of the Identification Bureau who agreed to contribute $200 to Lerner would necessarily be members of the same conspiracy.[17] Moreover, if the government were correct that the "Lerner transaction" and the other transactions charged in the Indictment were all part of a single conspiracy, every employee who ever contributed $100 during the past ten years would also be a conspirator. In other words, once the Sheriff's Office as an entity is viewed as a racketeering enterprise, everyone in it who ever *made or collected* an illegal payment would be bound together as racketeers.[18]

In this case the government charges that the conspiracy began merely ten years ago; under its theory, however, it could charge Cryan, Leonardis and Neri with transgressions committed much earlier. The fact that RICO may be violated by the systematic extraction of money from employees during a finite period does not convert the Sheriff's Office as an *entity* into a criminal organization, such that *any* extortion, bribe or other racketeering activity committed by any employee becomes thereby a violation of RICO chargeable against everyone in the office. The government simply may not convict these defendants on the basis of allegations of a corrupt system of extracting money from county employees, practiced from generation to generation, administration to administration, and from party to party, by scores of persons most of whom have long passed from public office, if not from life itself.

Although it is unnecessary for the Court to define the precise contours of RICO, it is clear that to convict these defendants the government must show that they either committed or authorized the acts charged in the Indictment. The Court finds that the government has failed to persuade it that

Title 18 United States Code § 1961(1).

**16.** The government itself has wavered in its contentions as to the scope of the conspiracy and the identity of the conspirators. Although it appears essential to the government's theory to establish an agreement between Lerner and Furlong to conduct the affairs of the Sheriff's Office through a pattern of racketeering activity, and to establish that the "Lerner transaction" was committed in furtherance of that agreement, the government at one point contended that Lerner and Furlong were not co-conspirators with respect to that transaction:

THE COURT: Now, let's talk about Furlong's role as an unindicted co-conspirator in this transaction, shall we?

What makes him an unindicted co-conspirator in this transaction and not every other payor? . . .

\* \* \* \* \* \*

MR. BENNETT: He is not charged with being an unindicted co-conspirator with respect to the Lerner payment. It is not the government's theory that he was a co-conspirator in that case.
(Tr. 1/15/80, pp. 1485–86.)

**17.** Furlong apparently devised the scheme, as well as participated in it. He and another member of the Identification Bureau delivered the money to Lerner. Nonetheless, he was no more or less culpable than the other contributors and, like them, was as much a victim as a perpetrator of the illegal transaction.

**18.** The government's attempt to classify the "Lerner transaction" as bribery and the other transactions as extortion does not solve this dilemma, because under New Jersey law the two crimes overlap. *State v. Begyn*, 34 N.J. 35, 167 A.2d 161 (1961). Any payment to Cryan or Lerner made with the purpose of gaining consideration in the Sheriff's Office might violate both state bribery and extortion laws—bribery in the giving, bribery and extortion in the taking.

the "Lerner transaction" is admissible against anyone but Lerner and also that no reasonable juror could conclude, beyond a reasonable doubt, that the "Lerner transaction" is part of the conspiracy charged against all four defendants in the remainder of Count One. *See Kotteakos v. United States, supra,* 328 U.S. at 773–74, 66 S.Ct. at 1252; *United States v. Bertolotti,* 529 F.2d 149, 155 (2nd Cir. 1975). Thus, Counts One and Two of the Indictment, which charge the "Lerner transaction" against all four defendants, are defective.[19]

### III. AMENDMENT OF THE INDICTMENT

Having determined that the "Lerner transaction" was improperly charged in Counts One and Two, the Court must now determine whether these counts may be amended by striking allegations of the "Lerner transaction" or whether the counts must be dismissed.

 The power of a court to "amend" an indictment is limited by the Fifth Amendment guarantee that an individual be tried only on a charge returned by a grand jury. *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). A court may not substitute its views or the views of the prosecu-

tion for those of the grand jury. *See United States v. De Cavalcante,* 440 F.2d 1264, 1271–72 (3rd Cir. 1971). If an indictment is defective because it charges two or more distinct offenses in a single count—for example, two bank robberies—the court may require the government to elect the offense on which it will proceed.[20] In such cases there is no confusion as to the intentions of the grand jury, and striking one of the offenses does not alter the fundamental character of the indictment. *See United States v. McCrane,* 527 F.2d 906, 912–13 (3rd Cir. 1975), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2227, 48 L.Ed.2d 831 (1976).[21] A more difficult situation arises when, as here, multiple conspiracies are charged in a single count. The distinction between separate conspiracies is frequently subtle. When two conspiracies between different groups of people have been welded improperly into one, the intentions of the grand jury are seldom susceptible to analysis, making it improper for the Court even to attempt any amendment.

 Counts One and Two of this Indictment intertwine separate transactions between unrelated persons and fuse them into a single criminal offense. Most of the acts alleged in both Counts relate to a scheme to extort payments on a regular basis from

---

**19.** Count Two is defective for another reason. The "Lerner transaction" and many of the other acts of bribery and extortion charged against all four defendants were committed prior to the entry of one or more defendants into the alleged conspiracy. Although a defendant may be charged with prior acts of a co-conspirator in a conspiracy count, he may be charged only with those substantive acts of co-conspirators committed by them after he had joined the conspiracy. He may not be charged substantively with acts committed prior to his entry into the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In view of its disposition of this case, the Court need not decide whether this defect could be cured by striking allegations in Count Two or by a limiting instruction, or whether it would require dismissal of the entire Count.

**20.** *United States v. Starks,* 515 F.2d 112, 116 (3rd Cir. 1975). *See also United States v. Browning,* 572 F.2d 720, 725–26 (10th Cir.),

*cert. denied,* 439 U.S. 822, 99 S.Ct. 88, 58 L.Ed.2d 114 (1978); 8 Moore's Federal Practice ¶ 8.04; 1 Wright, Federal Practice & Procedure § 145.

**21.** The government argues that none of the overt acts alleged in Count One are essential to the conspiracy charge because section 1962(d) does not require the averment of overt acts in furtherance of the conspiracy. *See United States v. Adamo,* 534 F.2d 31, 38 (3rd Cir.), *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). Whether Count One would charge a conspiracy even if some or all of the overt acts were stricken is irrelevant. The question is whether it would charge the *same* conspiracy *intended by the grand jury.* Similarly, the Court need not decide whether Count Two would charge a "pattern of racketeering activity" if allegations of the "Lerner transaction" were stricken, but rather we must decide whether it would charge the *same* pattern of racketeering activity.

employees in all divisions of the Sheriff's Office. The "Lerner transaction," although not part of this scheme, is integrated into the other charges and is in fact the largest single monetary transaction charged in the Indictment. That particular act of bribery appears even more significant in view of the theory which the government has espoused both at trial and in the course of these motions: the government has consistently viewed the "Lerner transaction" as the cornerstone of the conspiracy which Cryan, Leonardis and Neri later joined. The defects in that theory make it impossible for the Court to determine whether the grand jury would have returned these particular charges had it considered the "Lerner transaction" only against Lerner. Thus, striking allegations of the "Lerner transaction" would constitute an impermissible amendment to the Indictment. *See United States v. Goldstein*, 502 F.2d 526, 529 (3rd Cir. 1974); *United States v. De Cavalcante*, 440 F.2d 1264, 1272 (3rd Cir. 1971).

Accordingly, Counts One and Two of the Indictment will be dismissed.[22]

---

**22.** Defendants contend that the remaining three counts, charging defendant Lerner with perjury, should be dismissed based on the defects in the first two counts. The Court has found no authority for the proposition that a defect in one count of an indictment is in itself sufficient grounds for dismissal of other counts charging violations of unrelated statutes. Defendants' motion to dismiss these counts is denied.