**UNITED STATES of America**

v.

**Morris DONSKY, et al.**

**Crim. No. 86–211.**

United States District Court,
D. New Jersey.

Dec. 8, 1986.

Thomas W. Greelish, U.S. Atty. by Victor Ashrafi, Asst. U.S. Atty., Newark, N.J., for U.S.

Jeffrey S. Feldman, Livingston, N.J., for defendant Morris Donsky.

Critchley & Roche by Michael Critchley, West Orange, N.J., for defendant Herbert Reinfeld.

Abromson & Carey by Glenn B. Carey, Newark, N.J., for defendant Leroy Glenn.

Elmer J. Herrmann, Jr., Newark, N.J., for defendant Michael Zmirich.

Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan by David L. Harris, Roseland, N.J., for defendant Robert Rix.

STERN, District Judge.

The defendants, four food inspectors and their supervisor, were indicted for taking, and for conspiring to take, bribes from Leo Keller Corporation, a Newark meat-packing plant. On September 15, 1986, this matter came on for trial before this Court. After the completion of opening statements, the defendants moved for a mistrial based on the insufficiency of the government's opening statement and to have the indictment dismissed for improperly charging multiple conspiracies in Count One. This Court granted the application for mistrial, and provided the parties with additional time to respond to the motion to dismiss and sever.

Count One of the indictment purports to charge a single, continuing conspiracy among and between all of the indictees and other unnamed and unindicted co-conspira-

tors to pay bribes to the United States Department of Agriculture ("U.S.D.A.") food inspectors in exchange for allowing Leo Keller Corporation to submit fraudulent samples of its meat products to the U.S.D.A. laboratories for testing. Among other things, the count charges that at least $50,000 in bribes were paid and received during the course of the alleged conspiracy, and that several of the defendants regularly received weekly payments of $100–300.

Defendants argue that the government's evidence, at best, shows that the owners and managerial workers of Leo Keller Corporation may have been separately attempting to bribe individual U.S.D.A. food inspectors in order to receive preferential treatment. The indictment, they claim, improperly charges a number of individual conspiracies—without common agreement or objectives—within one count.

This Court is of the opinion that Count One charges multiple conspiracies, rather than a single conspiracy. As in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the government's proofs are at variance with the single conspiracy charged in Count One. Moreover, this Court finds that the single charge of conspiracy, in light of the dearth of evidence supporting the charge and the subtle, confusing nuances of the *Kotteakos* challenge, would unfairly confuse the jury and prejudice the defendants. This Court will, therefore, dismiss Count One of the indictment and grant defendants' motion for a severance. The defendants' motion to dismiss the entire indictment is denied.

*The Government's Proffer of Evidence*

In its brief in opposition to the defendants' motion to dismiss, the government presents a history of the "conspiracy" to defraud the U.S.D.A., dating back to the mid–1970's, when federal inspection of the Leo Keller plant began. According to the government, a number of different dramatis personnae have been involved in this scheme since that date. For the sake of clarity, the actors are as follows: *Max Keller* and *Otto Gold*, managerial employees of the Leo Keller Corporation; *Herbert Bartsch*, an employee of the corporation who supposedly prepared the samples; *Patrick McHale*, a U.S.D.A. meat inspector and government agent; *Robert Rix*, the inspectors' supervisor in Newark until September 1981; *Morris Donsky, Herbert Reinfeld, Leroy Glenn, Michael Zmirich* and *Salvatore Vicari*, U.S.D.A. meat inspectors. Keller, Gold, Vicari and Bartsch have pleaded guilty. The government also contends the existence of unindicted co-conspirators.

Between 1981 and 1985, defendants Donsky, Reinfeld, Glenn and Zmirich, along with inspectors Vicari and McHale, each spent at least one regular six-month assignment as a daytime meat inspector for the Leo Keller Corporation. One other meat inspector, Joseph Tumminello, was given a six-month assignment at the plant during this period. The government contends Mr. Tumminello is an unindicted co-conspirator. Further, the calendar summaries provided by the government show periods in which relief duty was performed at the plant, other than the regular six-month assignments. Three inspectors, other than the defendants or McHale and Vicari, inspected the meat during these visits. Two, Mr. Tumminello and Jim Williams, are alleged by the government to be unindicted co-conspirators. The third, Laverne Beecher, had a single two-week assignment in the plant, and is not alleged to be a co-conspirator.

The government argues that from about 1979 through 1985, prepared special samples were produced by defendant Bartsch and his subordinates, and were packaged and stored in a freezer in the corporation. Each of the defendant inspectors, between 1979 and 1985, allegedly approached Bartsch on various occasions and requested samples. Sometimes, instead of obtaining the samples directly from the Leo Keller employees, the inspectors allegedly took the samples directly from the freezer.

The government contends that in addition to this common "method" of obtaining samples, the bribe money was delivered in

**634**

a common fashion as well. As the government describes this "common method,"

> [C]ash was given to the inspector, usually in a white envelope, wherever Keller or Gold might run into the inspector without other people present. Few words if any were spoken during the payments.

Government's Brief at 12. According to the government, the amounts received by the inspectors were the same, gradually increasing over the life of the "conspiracy." By the fall of 1983, the payments were allegedly $200 per week.[1]

The government contends that defendant Donsky was the "leader" of the conspiracy. As leader, he received higher payment and, according to the government, was responsible for warming up new inspectors. Max Keller, according to the government, will testify that he would ask Donsky whether it was safe to pay the next inspector scheduled, and Donsky would either say yes or tell Keller that he would talk to the new inspector.

The "scheme" was uncovered by Inspector McHale in September 1983. After reporting being offered a bribe at the plant, McHale agreed to become an undercover agent. Much of the government's proffer consists of covert tape recordings made by McHale in September 1983, March 1984, and September through November 1984.

The government's proffer does provide some evidence tying the defendants together. There is evidence to suggest that defendant Donsky was asked, on a number of occasions, whether future inspectors were "safe" to bribe. There is also some evidence suggesting that individual defendants were aware that others were taking bribes from the plant as well. Further, the government's proffer does point to an isolated incident of shared profits—one defendant relieved another over a two-week period, and the absent defendant demanded half of the money received during his absence. Finally, the government's "strong-

est" evidence of a common scheme or enterprise is the longevity and continuity of the bribery activity at the plant.

Noticeably absent from the government's proffer is any evidence suggesting an *agreement* among the defendants to commit the alleged offenses. Further, the proffer, other than in the isolated incident noted above, presents absolutely no evidence of shared profits. Finally, the government's proffer tends to *support*, rather than disprove, the defendants' contention that the defendants were acting as individual entrepreneurs, rather than as an organized group acting together in furtherance of a common goal. The government cites a conversation which occurred between defendant Donsky and Inspector McHale in September 1984. Part of that conversation was as follows:

> MORRIS DONSKY: And, ah ... That's the people with the sanitation. And as far as the clean-ups in the kitchen, Manuel, the guy you talk to there. And if you need samples ... you tell him what you want, and its up to you....
>
> PATRICK McHALE: Okay.
>
> MORRIS DONSKY: ... how you want to handle that.
>
> PATRICK McHALE: They give us the samples.
>
> MORRIS DONSKY: You want them, you want to take them yourself? You take them.
>
> PATRICK McHALE: All right.

Government's Brief at 16–17. Rather than suggesting an organized conspiracy to defraud the U.S.D.A., this evidence tends to demonstrate that the decision to take meat samples was a personal decision, up to the individual meat inspector.

■ The issue before the Court on this motion is whether, as in *Kotteakos*, the government's proofs are at variance with the single conspiracy charged in Count One. The existence of a single conspiracy

---

1. Defendant Rix was the circuit supervisor from early 1980 through September 1981, during which time he was required to make periodic visits to the plant. Defendant Rix allegedly received $100 per month in bribes.

is ultimately a factual question left to the jury's determination. *United States v. Smith*, 789 F.2d 196 (3d Cir.1986); *United States v. DiPasquale*, 740 F.2d 1282 (3d Cir.1984), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985). The indictment need only allege enough to permit a jury to infer the existence of a common design, plan or goal among the conspirators. *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1975). For the purposes of this motion, the Court must determine whether the government's proffer, viewed most favorably to the government, constitutes substantial evidence from which a jury could find a single conspiracy and each defendant's participation in it. *United States v. DePeri*, 778 F.2d 963, 975 (3d Cir.1985).

■ The government's proffer of evidence falls short of permitting this Court to find that a reasonable juror could infer a single, common enterprise. Rather, the evidence demonstrates the existence of multiple conspiracies—that the defendants were acting as individual entrepreneurs, each acting on his own account. What we have here is no more than a group of police officers, each accepting bribes from motorists or merchants while serving different hours on a common beat. Each officer makes his own deal and, while undoubtedly aware of the venality of others, each keeps his own "take." There is simply no common enterprise, working together, or organization.

It is now well settled that a material variance between the indictment and the government's evidence is created by the government's proof of multiple conspiracies under an indictment alleging a single conspiracy. In *Kotteakos v. United States, supra*, the indictment alleged a single conspiracy to obtain government loans by making fraudulent representations, but the government's proof at trial demonstrated eight separate conspiracies. The Court noted that the common element in these conspiracies consisted solely of one man who had directed each group. Despite their similar objectives and despite their common leadership, none of the *Kotteakos* conspiracies aided or benefited from the others. The Court wrote that Congress never:

... intended to authorize the Government to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all.

*Id.* at 773, 66 S.Ct. at 1252.

The distinction must be made, therefore, between separate conspiracies, in which certain parties are common to all, and a single conspiracy, in which the various parties are joining and terminating their relationship at different times. As one court has noted:

Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others who achieve a common goal may be members of an overall conspiracy.

In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy.

*United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969).

The government's proffer is devoid of any evidence of an agreement among the alleged co-conspirators to commit the alleged offenses. Clearly, it is not necessary for the government to prove that each conspirator knew the identities of all his co-conspirators, or that he was aware of all the details of the alleged conspiracy. *United States v. DePeri*, 778 F.2d 963, 975 (3d Cir.1985). However, the proffer fails to demonstrate that the defendants worked together towards the achievement of a common goal, or that they operated in any manner other than as individual entrepre-

neurs, each promoting his own bribery activity.

Second, as noted earlier, the government's proffer tends to buttress the defendants' argument that the first count alleges multiple conspiracies, rather than a single, coherent conspiracy. The evidence suggests that the decision whether to take prepared samples and money from the plant was one reserved for the inspectors themselves—one which was not aimed at furthering any enterprise or scheme, but simply at padding the pockets of individual U.S.D.A. agents. Some agents allegedly took bribes; some did not. There is only the slightest allegation of shared proceeds; and at that, an isolated incident covering only two weeks out of an alleged multiyear conspiracy.

The government cites several recent Third Circuit opinions discussing the issue of variance and multiple conspiracies. While language in the opinions is facially supportive of the government's claim, a careful reading of the cases demonstrates the inadequacy of the government's proffer.

For instance, the government cites *United States v. DePeri*, 778 F.2d 963 (3d Cir. 1985), for the proposition that "where the defendants had a common goal of extorting protection payoffs, the method of extortion in all cases was similar, and some of the defendants came in contact with other defendants in dividing the profits and enforcing the scheme, the Government's proofs were sufficient to show a single conspiracy." Government's Brief at 36. The government's argument ignores the concrete factual circumstances proved through the evidence in *DePeri* and the gaps in the government's proofs in this case. In *De-Peri*, the court summarized the extensive direct proofs supporting the single conspiracy alleged before it:

> The common goal was the extortion of poker machine vendors and numbers parlors; the method of extortion in all cases was similar—the machines would be seized and sold back to the operators for the same price, the protection money

ranged between fifty and one hundred dollars per machine in all areas, the victims paid on the first and fifteenth of the month, there was a common code name ("Whitney") that was passed on to the bagmen, the money was collected and passed "up the ladder to the Inspectors ...; and the defendants, although stationed in different divisions, came into contact with one another in the course of dividing the profits from and enforcing the protection scheme."

*Id.* at 975. Other than an isolated incident between two co-defendants, the government's proffer does not provide any evidence of shared profits and joint effort over the several years of this alleged conspiracy.

Similarly, the government cites *United States v. DiPasquale*, 740 F.2d 1282 (3d Cir.1984), in which the Court of Appeals considered a *Kotteakos* challenge to convictions of several defendants on a single count of conspiracy. Six defendants had been convicted of conspiring to collect debts by extortionate means. The court in *DiPasquale* noted that in finding evidence of a single conspiracy, "the similarity of method and result, and the partial overlap of participants, in the various incidents ... is probative of a unitary conspiracy." *Id.* at 1290. The court further noted in *Di-Pasquale* the necessity of tying the interests of the individual defendants with the success of the alleged conspiracy, stating that:

> We agree that those convicted of conspiracy must not only be aware of another person's illegal scheme, but must in some sense promote [the] venture himself, make it his own, have a stake in its outcome.

*Id.*

The government's proffer in the present case falls short of that called for in *Di-Pasquale*. In *DiPasquale*, the court concluded that there was one overall conspiracy, directly evidenced by the use of common resources, the overlapping of actors, and the "interdependency of component agreement." *Id.* at 1291. The court distin-

guished the case before it from those asserted by the defendants by stating that: "By contrast, in cases on which the appellants rely, there was virtually no evidence to connect parallel but distinct schemes." *Id.* In the present case, the proffer is devoid of any reference to agreements between and among the participants, and virtually naked of any evidence of shared proceeds.

Moreover, this Court is of the opinion that considering the subtle nuances of the *Kotteakos* challenge, and the lack of evidence to support a single conspiracy charge, retention of Count One would both unfairly prejudice the defendants and confuse the jury. This analysis is not dissimilar from that undertaken by the Court when considering a Rule 403 challenge to the admissibility of evidence, or Rule 14 request for a severance of offenses or defendants. In the present case, this Court is of the opinion that justice requires dismissal of Count One.

Having reviewed the government's proffer of evidence, this Court finds that Count One charges multiple conspiracies, rather than a single conspiracy. The proffer does not demonstrate that these defendants were working together towards the achievement of a common scheme or enterprise; rather, these defendants can more properly be viewed as individual entrepreneurs, each acting on his own account. In sum, this Court is not convinced that a reasonable juror could find one conspiracy, instead of multiple conspiracies, as the government has alleged in Count One. The question is clearly not free from doubt. However, in light of the consequence of error, the prejudice which attaches to the joinder of these defendants, and the inadequacy of the government's proffer, this Court will dismiss Count One of the indictment, and grant the defendants' motion for a severance.

The defendants also move for dismissal of the entire indictment, claiming the taint of the first count pollutes the remaining counts. As support, defendants cite language from *United States v. Cryan*, 490 F.Supp. 1234 (D.N.J.1980), to the effect that multiple offenses should not be charged in the same count of an indictment. *Id.* at 1239.

Defendants fail to note, however, that this Court wrote, in *Cryan*, that dismissal of the entire indictment was not warranted, even though the conspiracy charge was dismissed.[2] The indictment in the present case charges each defendant separately with recurring bribes in a total of 27 substantive counts. There is no evidence to suggest that the defendants were indicted on the substantive offenses on a theory of conspiratorial liability. As such, this Court is of the opinion that dismissal of the entire indictment is unwarranted.

For the reasons set forth in this Court's opinion filed herewith,

It is on this 8 day of December, 1986,

ORDERED that Count One of Indictment No. 86–211 be, and it hereby is, dismissed; and it is further

ORDERED that defendants' motion for severance be, and it hereby is, granted; and it is further

ORDERED that defendants' motion to dismiss the entire indictment be, and it hereby is, denied.

2. Footnote 22 reads:

Defendants contend that the remaining three counts, charging defendant Lerner with perjury, should be dismissed based on the defects in the first two counts. The Court has found no authority for the proposition that a defect in one count of an indictment is in itself sufficient grounds for dismissal of other counts charging violations of unrelated statutes. Defendants' motion to dismiss these counts is denied.

*Id.* at 1245, n. 22.