UNITED STATES of America,

v.

Michael **CLEMENTE**, Tino Fiumara, Thomas Buzzanca, Vincent Colucci, Carol Gardner, Michael Copolla, Gerald Swanton, Defendants.

S 79 Cr. 142 (LBS).

United States District Court, S. D. New York.

July 10, 1980.

John S. Martin, Jr., U. S. Atty., New York City, S. D. N. Y. by Michael S. Devorkin, and Daniel H. Bookin, Asst. U. S. Attys., New York City, Paul A. Victor, Alan Dershowitz, and Nathan Dershowitz, New York City, for defendant Clemente.

Dennis D. S. McAlevy, Hobakin, N. J., for defendant Fiumara.

Gilbert Rosenthal, and Irving Anolik, New York City, for defendant Buzzanca.

Dino D. Bliablias, Newark, N. J., and Carl M. Bornstein, New York City, for defendant Colucci.

Martin S. Goldman, East Orange, N. J., for defendant Gardner.

Joseph A. Hayden, Jr., Newark, N. J., for defendant Copolla.

Thomas Durkin, Jr., Newark, N. J., and James Mahoney, West Orange, N. J., for defendant Swanton.

## OPINION

SAND, District Judge.

■ After an eleven week trial, defendants Clemente, Fiumara, Buzzanca, Colucci and Gardner were convicted by a jury, on May 2, 1980, of violating the Taft-Hartley Act, 29 U.S.C. Section 186 and 18 U.S.C. Section 2, the Hobbs Act, 18 U.S.C. Section 1951 and 18 U.S.C. Section 2, the federal Racketeering [RICO] Statute, 18 U.S.C. Section 1962(c),[1] and of conspiring to violate the RICO Statute, 18 U.S.C. Section 1962(d). Defendant Copolla was convicted of conspiring to violate the RICO Statute; however, the jury was unable to reach a verdict on the two Hobbs Act counts, the two Taft-Hartley counts, and the RICO count, with which he was charged.[2] Defendant Swanton was convicted of violating the Hobbs Act, 18 U.S.C. Section 1951, 18 U.S.C. Section 2, and of making false material declarations before a grand jury, 18 U.S.C. Section 1623. Defendants Clemente, Fiumara, Colucci and Gardner were also convicted of filing false income tax returns, 26 U.S.C. Section 7206(1); and defendant Clemente was also convicted of income tax evasion, 26 U.S.C. Section 7201.[3]

---

1. Section 1962(c) provides in pertinent part: "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."
Section 1961(5) states that "pattern of racketeering activity" requires at
"least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

2. In light of the inability of the jury to reach a verdict on the Hobbs Act and Taft-Hartley Act counts, and hence to find that Copolla had engaged in a "pattern of racketeering activity," the jury was precluded from considering whether Copolla had violated 18 U.S.C. Section 1962(c), the RICO Statute. See note 1, *supra*.

3. The indictment alleged:
"1. MICHAEL CLEMENTE, the defendant, formerly an official of Local 856, International Longshoremen's Association (hereinafter sometimes referred to as 'ILA') Manhattan, New York, is, and was, by position, in-

All the defendants have moved for a judgment of acquittal or a new trial, and we amplify herein the grounds upon which those motions were denied from the bench.

## I. THE INDICTMENT

At the outset, it would be appropriate to give a brief overview of the structure of the indictment. The 157 counts which were contained in the indictment considered by the jury, during its deliberations,[4] may be summarized as follows:

Count 1 (hereafter the RICO count) charged that from on or about January 1, 1971 until the filing of the indictment, in violation of 18 U.S.C. Sections 1962(c) and 2, defendants Clemente, Fiumara, Buzzanca, Colucci, Gardner and Copolla were

"persons employed by and associated with an enterprise, to wit, a group of individuals associated in fact to corruptly control and influence the waterfront industry in the port of New York and other ports in the eastern United States."

The RICO count further alleged that the affairs of such enterprise were conducted "through a pattern of racketeering activity, which included, among other things, acts of extortion in violation of Title 18, United States Code, Sections 1951 and 2, and receipt of unlawful payments in vio-

lation of Title 29, United States Code, Section 186(b), and Title 18, United States Code, Section 2."

Counts 3 through 142 were alleged as predicate offenses of the RICO count.

Count 2 alleged a conspiracy to commit the offense alleged in the RICO count by the defendants named therein. The payments and acts specified in Counts 3 through 142 were alleged as some of the overt acts committed by the defendants and their co-conspirators in furtherance of the conspiracy.

Counts 3 through 6 alleged that Gardner and Colucci, in violation of 18 U.S.C. Sections 1951 and 2, extorted or attempted to extort from Quin Marine Services, Inc. (hereafter "Quin") the four payments therein alleged, each payment forming the basis for a separate count. The indictment charged that each of the payments were "demanded and received as a condition of and in exchange for Quin receiving and retaining the carpentry and lashing business from Concordia Line in Newark, New Jersey."

Counts 8 through 11, predicated on the same four payments set forth in Counts 3 through 6, alleged that the defendants Gardner and Colucci, as representatives of

fluence and reputation a controlling figure with respect to waterfront businesses and officials of the ILA.

"2. TINO FIUMARA, the defendant, is, and was, by position, influence and reputation a controlling figure with respect to waterfront related businesses and officials of the ILA.

"3. THOMAS BUZZANCA, the defendant, from on or about December, 1976 to the date of filing of this indictment is, and was, President, Locals 1804 and 1804-1, ILA, 403 Greenwich Street, New York, New York; organizer, ILA, 17 Battery Place, New York, New York; and from at least January 1, 1975 to December, 1976, was business manager, Local 1804-1.

"4. VINCENT COLUCCI, the defendant, is, and was, President and Secretary-treasurer, Locals 1235 and 1478-2, ILA, 30 Hennessey Street, Newark, New Jersey; from at least October, 1976, organizer, ILA, 17 Battery Place, New York, New York, and Vice-president, Atlantic Coast District, ILA, 17 Battery Place, New York, New York.

"5. CAROL GARDNER, the defendant, is, and was, President, Local 1233, ILA, 731 S. 10th Street, Newark, New Jersey; and organizer, ILA, 17 Battery Place, New York, New York; and from 1973, an organizer of and from October, 1976, Vice-president, Atlantic Coast District, ILA, 17 Battery Place, New York, New York.

"6. MICHAEL COPOLLA, the defendant, is, and was, an associate of TINO FIUMARA, the defendant.

"7. GERALD SWANTON, the defendant, was from approximately 1969 through May 1, 1974, a vice-president of Netumar International Inc., 67 Broad Street, New York, New York."

4. Three of the 160 counts contained in the indictment when trial commenced, Counts 7, 12 and 86, were dismissed for lack of sufficient evidence at the close of the Government's direct case. The count members in the following discussion refer to the redacted indictment utilized by the jury in its deliberations.

employees employed in an industry affecting commerce, received illegal labor payments in violation of 29 U.S.C. Section 186(b) and 18 U.S.C. Section 2.

Count 13 alleged that Gardner and Colucci attempted to extort monthly payments from Quin in exchange for its retaining its rights to perform work for the Chilean Line in Newark, New Jersey, in violation of 18 U.S.C. Sections 1951 and 2.

Counts 14 through 48 alleged that from on or about January, 1976 through December, 1978 Fiumara and Buzzanca, specifically aided and abetted by Copolla in Counts 36 and 43, extorted or attempted to extort monthly cash payments of $2,000 from Quin in order to retain the Concordia Line work. It was also alleged that until May 19, 1978, Quin and Castelo and Sons Ship Servicing, Inc. provided an equal share of these monthly payments. Thereafter, all of the money for the payments came from Quin. Each of the 35 alleged payments formed a separate count under 18 U.S.C. Sections 1951 and 2.

Counts 49 through 83 paralleled each of the payments alleged in Counts 14 through 48 and alleged that Buzzanca, being an employee's representative, Fiumara, Clemente and, with respect to Counts 71 and 78, Copolla, demanded and received said payments in violation of 29 U.S.C. Section 186(b) and 18 U.S.C. Section 2.

Counts 84 and 85 were alleged against Buzzanca and Gardner, respectively, and each count alleged a $1,000 cash payment from Quin in violation of 29 U.S.C. Section 186(b).

Counts 87 through 142 alleged that from on or about January, 1974 through December, 1978, Clemente, aided and abetted by Gerald Swanton, attempted to affect commerce by extortion and did obstruct, delay, and affect commerce by extortion, in that Clemente obtained monthly payments totaling more than $42,000 from Quin in exchange for Quin's obtaining and retaining carpentry and lashing business from Netu-

mar Line at Pier 36, Manhattan. Each such alleged monthly payment was set forth as a separate count under 18 U.S.C. Sections 1951 and 2.

Counts 143 through 146 alleged that Gerald Swanton made false material declarations before a grand jury investigating whether Clemente, or anyone else, had participated in extortion, racketeering, illegal labor payments and tax evasion. Each false statement was alleged as a separate violation of 18 U.S.C. Section 1623.

Counts 147 through 156 were income tax charges against Michael Clemente. In Counts 147, 149, 151, 153 and 155, he was charged with evading the payment of federal income taxes on more than $900,000 in payments he was charged with receiving for the years 1973, 1974, 1975, 1976 and 1977, in violation of 26 U.S.C. Section 7201. Counts 148, 150, 152, 154 and 156 charged Clemente with filing false personal tax returns for those five years for not reporting those payments in violation of 26 U.S.C. Section 7206(1).

Count 157 alleged that Fiumara omitted a substantial amount of income from his 1976 adjusted gross income in his 1976 federal income tax return in violation of 26 U.S.C. Section 7206(1), and Count 158 contained a similar charge against this defendant with respect to his 1977 return.

Count 159 alleged that Colucci omitted a substantial amount of income from his 1975 return and Count 160, the last count, alleged that Gardner similarly omitted a substantial amount of income from his 1975 return, in violation of 26 U.S.C. Section 7206(1).

In addition to these 157 counts, the indictment considered by the jury sought forfeiture of the interests of certain defendants pursuant to 18 U.S.C. Section 1963.

With the exception of defendant Copolla, each of the defendants was convicted on every count in which he was charged in the indictment.[5]

5. The jurors voted the forfeiture of union offices by those defendants who held such positions but did not vote for forfeiture of any monetary amounts, although such forfeiture was sought by the Government with respect to certain defendants.

## II. MISJOINDER

### A. *Pretrial Motions*

At the pretrial stage of this case, the defendants, with the exception of Swanton, moved for severance based on claimed misjoinder under Rule 8 of the Federal Rules of Criminal Procedure. Rule 8 provides:

"(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

"(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

When a defendant in a multiple-defendant case attacks the joinder for trial with defendants who are named in counts with him or in other counts, Rule 8(b) governs. *United States v. Turbide,* 558 F.2d 1053, 1061 n.7 (2d Cir.), *cert. denied sub nom., Perez v. United States,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *United States v. Papadakis,* 510 F.2d 287, 300 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).

When a defendant in a multiple defendant case named in one count seeks to sever other counts in which he alone is charged, Rule 8(a) controls. *United States v. Isaacs,* 493 F.2d 1124, 1158 (7th Cir.) (per curiam, Lumbard, J. on panel), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974).

In its opinion of July 11, 1979, the Court noted that the Government had correctly categorized the defendants' motions as follows:

"The defendants allege misjoinder here on three principal grounds. First, they attempt to parse the indictment's conspiracy and racketeering charge into what they perceive to be sub-enterprises or sub-conspiracies, and then argue duplicity and misjoinder of these allegedly 'separate' enterprises or conspiracies. Second, they extend this claim to the various counts alleging the predicate offenses to the racketeering count and assert these too must be separated along the lines of the alleged sub-conspiracies. Finally, they claim that various miscellaneous charges, for example, the tax counts . . . are misjoined both as to defendants and charges." Govt. Memo, p. 18.

In response to these contentions, the Government argued that Counts 1 and 2, the central allegations in the indictment, charged defendants Clemente, Fiumara, Buzzanca, Colucci, Gardner and Copolla with conducting and participating in the affairs of an enterprise through a pattern of racketeering activity and with a conspiracy to do so. It contended that joinder was proper because Counts 1 and 2 linked the defendants together in a common plan and common action, and because both counts explicitly incorporated by reference the substantive predicate charges (Counts 3–142). Govt. Memo at 20. The Government further represented that joinder of the tax and false declaration counts was proper because they were offenses growing out of and depending substantially for their proof on the facts necessary to prove the underlying charges. *Id.* at 26.

The indictment alleged that

"7. It was a part of the pattern of racketeering activity that Michael Clemente, the defendant, had as his principal territory and area of influence and control Piers 36 and 42, East River, Manhattan, and certain companies doing business on those piers and elsewhere, and certain entities doing business with these companies; and that Tino Fiumara, Thomas

Buzzanca, Vincent Colucci, Carol Gardner, and Michael Copolla, the defendants, had as their principal territory and area of influence and control the New Jersey portion of the Port of New York, primarily Newark, and companies doing business within that territory, and certain entities doing business with these companies.

"8. It was further a part of the pattern of racketeering activity that Tino Fiumara, the defendant, did supervise, direct and control many of the activities of Thomas Buzzanca, Vincent Colucci, Carol Gardner, and Michael Copolla, the defendants, as members of the enterprise.

"9. It was further a part of the pattern of racketeering activity that Michael Clemente, the defendant, did exercise influence over and with officials of the ILA."

(Count 1.)

In its offer of proof, the Government stated:

"The group of individuals associated in fact to form . . . [the RICO] enterprise had one common objective: the corrupt control and influence over the waterfront industry in the Port of New York and other ports in the Eastern United States in order to enrich themselves and their associates. The defendants' efforts to achieve this objective centered upon their establishing and maintaining control and influence over waterfront companies and unions and then demanding tribute for the benefits of labor peace and systematically promoting and distributing work among selected companies in exchange for payoffs.

"In order to enhance the effectiveness of this corrupt system and as a part of the overall plan and pattern of control, the defendants maintained and recognized each other's areas of control and domination with the overall enterprise. The indictment charges and proof at trial

will show that, although Clemente and Fiumara concentrated their activities in different geographic areas, the two men *worked together* in conducting the affairs of the enterprise. Clemente directed how certain payments regarding Concordia Line were to be made to Fiumara, and both men pooled their efforts to acquire more business for Quin Marine Services . . . in connection with that company's payments.

"By and large, the charges proving the RICO conspiracy relate to payoffs demanded and obtained from one victim, Quin Marine Services, in return for the privilege of Quin's doing business at various locations within the Port of New York. While the enterprise's efforts to bring . . . [Quin] . . . directly within its system of payoffs began in late 1973 or early 1974, the background of these efforts goes back even further." (Govt. Memo) at 2–3 (citations omitted)

In light of the Government's representations, the Court denied the defendants'. motions for severance. At trial, the defendants renewed their misjoinder contentions, and the Court again denied them, having concluded that the essential representations put forth by the Government had indeed been substantiated, and that the initial joinder rulings were appropriate. The Court now reexamines these rulings in the light of the evidence introduced during the trial.

B. *The Evidence*

At trial, the Government introduced much of its evidence through its principal witness, William Montella, Jr.,[6] formerly the General Manager of Quin, and through tape recordings. Carol Gardner and Gerald Swanton were the only defendants who testified.

The evidence adduced by the Government at trial showed that beginning in 1970 or

6. Montella was cross-examined by the defendants for five days. (T. 3,950–5,238; 5,648–5,937). Although at one time the Court considered imposing limitations on the time allotted to defense counsel for cross-examination of the Government's key witness, after further

consideration no such limitation was imposed. Over the Government's vehement objection to repetitive cross-examination, the Court permitted each defendant's counsel, utilizing his own style and strategy, to attempt to convince the jury that Montella was not worthy of belief.

1971, while New Jersey Export Company, a carpentry and lashing concern, was doing work for Netumar Line at Pier 36 Manhattan, Gerald Swanton, a Netumar vice-president, demanded kickbacks from William Montella, Jr., in order for New Jersey Export to retain the Netumar account. (Montella, T. 3259, 3270, 3271).[7] Montella paid Swanton because he did not want New Jersey Export to lose Netumar business. (*Id.*, T. 3280, 3281). After he began paying Swanton, Swanton told Montella that he gave some of this money to Michael Clemente, the "boss" behind the scenes who ran the East River piers. (*Id.*, T. 3273). Swanton told Montella that he was "with Mike," that nothing "moved" on the piers unless Clemente approved. (*Id.*, T. 3273). He similarly told William Fiumara,[8] a Netumar employee, that Clemente was a powerful man. (Fiumara, T. 2793, 2794). James Ryan, another Netumar employee, would drive Swanton on occasion to meet Clemente. (Ryan, T. 2778). After a ship sailed, Montella would hand Swanton or William Fiumara an envelope. (Fiumara, T. 2867–69, 2946). (Ryan, T. 2779).

Montella continued to pay Swanton up until the time he left New Jersey Export in September 1972 for C. C. Lumber Company. (Montella, T. 3283). C. C. Lumber was owned by Joseph Lacqua, a cousin of Anthony Scotto, the president of the ILA Local 1814 in Brooklyn and the vice-president of the International. (*Id.*, T. 3286, 3287). Before leaving New Jersey Export for C. C. Lumber, Montella asked Swanton whether he could bring the Netumar account to his new company. (*Id.*, T. 3287). Swanton indicated that this would not be possible because his "guy," i. e., Clemente, and Scotto did not "get along." (*Id.*, T. 3286–87).

By the early part of 1974, Montella had left C. C. Lumber to work for Quin Lumber, a predecessor of Quin Marine Services.

(*Id.*, T. 3290, 3292). After Swanton had initiated a meeting, Montella went to see him. (*Id.*, T. 3292). Swanton explained that Clemente and Scotto were now friendly, and that he wanted Montella to have Netumar's business. (*Id.*, T. 3294). He further indicated that he would soon be leaving Netumar, and that he wanted Montella to meet Clemente at the Shelton Health Club and pay him $500 a month directly for the Netumar carpentry account. (*Id.*, T. 5203). In March or April of 1974, Montella met Clemente as Swanton had directed and agreed to pay him $500 a month for the Netumar carpentry account. (Overt Act 1) (*Id.*, T. 3295). After the first ship came in, Montella went to see Clemente at the Shelton Health Club and paid him $500 in cash in a white envelope. (*Id.*, T. 3298). Thereafter, until January 1977, he paid Clemente $500 a month, as alleged in extortion counts 87 through 119, because he believed that if he failed to make those payments, he would lose the carpentry account. (*Id.*, T. 3301, 3323, 3329). In January 1977, after Clemente had secured the Netumar lashing account for Quin Marine, in addition to the carpentry work, Montella agreed to increase his payments to $1,000 a month (Overt Act 13). (*Id.*, T. 3308, 3311). Montella gave Clemente $1,000 a month in an envelope up through December 8, 1978, as alleged in extortion counts 120 through 142.[9] (*Id.*, T. 3329). He feared that if he failed to make those monthly payments, Clemente would have Quin replaced and Quin would lose the Netumar account. (*Id.*, T. 3322, 3329).

During this same period of time when Swanton and then Montella were seeing and paying Clemente, Clemente used his position of power on the East Side Piers to obtain approximately $200,000 a year from Netumar Line in exchange for certain economic benefits obtained for Netumar in connection with its Pier 36 operation. (The "Netumar payments"). Initially, Clemente

---

7. (Montella, T. 3,259) signifies that Montella testified as to the statement preceding the citation at the indicated pages of the transcript. This form of citation will be utilized throughout this opinion.

8. William Fiumara is not related to defendant Tino Fiumara.

9. Many of the payments alleged in Counts 87–142 were corroborated by tape recordings.

discussed aspects of pier operations with Swanton. (Swanton, T. 10,408). Later, he established a relationship with Walter Gainsbury and Charles Mattmann, the owner and the president of Netumar Line, respectively. Swanton had told Mattmann that Clemente was "the man behind the scenes" on Pier 36 (Mattmann, T. 1696), and he arranged for Mattmann to meet Clemente. (*Id.*, T. 1705). Montella knew that Clemente was meeting with high Netumar officials. (Montella, T. 3310).

In 1972, Netumar concluded that Irving Held, its stevedore, who had been recommended by Fred Field, an ILA official, was charging an exorbitant fee for the use of his equipment on Pier 36. (Mattmann, T. 1723, Gainsbury, T. 2253–55). After Netumar failed to persuade Held either to sell the equipment at a reasonable price or substantially reduce the rental charge, Gainsbury and Mattmann decided to approach Clemente. (Mattmann, T. 1731–34). Clemente agreed to investigate the matter, with the understanding that he would receive 25 cents on every dollar he could save Netumar. (*Id.*, T. 1745). After Clemente intervened, Held decided to sell his equipment at a substantially reduced price. As a result, Gainsbury agreed to give Clemente approximately $200,000 in cash each year. (Mattmann, T. 1746; Gainsbury, T. 2274). These secret payments, made in cash and surreptitiously delivered, continued from 1973 through 1978.[10] (Mattmann, T. 1812, 1842).

In June 1975, Quin became involved in the New Jersey segment of the defendants' enterprise. At that time, the Castelos, owners of Castelo and Sons Ship Servicing, Inc., were approached by Carol Gardner, who demanded money in exchange for the right to do the work of Concordia Line, which was then moving to Newark. (Castelo, T. 6020).

The Castelos had previously dealt with Gardner, who had at one time demanded $1,000 a month from them in exchange for their right to retain the lashing work of Ecuadorian Line. (Overt Act 2), (Castelo, T. 5957, 5968). After discussing that matter with Dennis Meenan, the President of Ecuadorian Line, the Castelos acceded to Gardner's demand,[11] (Overt Act 3), (Castelo, T. 5968, 5974–75), (Meenan, T. 6173), and made monthly payments to him of $1,000 from April 1975 through the first part of 1978. (Castelo, T. 5977, 5978), (Cline, T. 8264, 8276), (Kelley, T. 7717).

The Castelos told Montella of Gardner's demand for kickbacks for the Concordia Line account. (Castelo, T. 6026), (Montella, T. 3346–47). Thereafter, Montella was in contact with Gardner. (Overt Act 4), (Montella, T. 3350).

At a subsequent meeting with Montella in Florida, Gardner and Colucci demanded $50,000 in exchange for giving the Concordia account to Quin instead of another company. (Overt Act 5), (Montella, T. 3353–3355). Eventually, after further discussions, an agreement was reached by which Montella paid "upfront money" of $15,000 and $5,000 to Gardner and Colucci, respectively, and agreed to pay $2,000 per month for the Concordia account. (Counts 3 through 11), (Montella, T. 3364). The Castelos entered into an agreement with Montella whereby they would contribute a $5,000 downpayment and $1,000 of the monthly payment in exchange for receiving the lashing portion of the Concordia account. (Montella, T. 3364), (Castelo, T. 6027). After Montella delivered the initial installment of the payments to Gardner at the Ramp Diner in New Jersey (Montella, T. 3367), he received a letter from the vice-president of operations for Concordia Line inviting him to bid for the Concordia work at Newark, and he eventually got the contract. (*Id.*, T. 3367). The Castelos made

---

**10.** For a discussion of the Court's evidentiary ruling with respect to the Netumar payments, see pages 1327–1328 *infra*.

**11.** Meenan testified as to various payments he made to Gardner in return for securing labor peace and other benefits. (Meenan, T. 6,189–93; T. 6,241–42). He testified that from the period commencing August 1975 until August 1978, he gave Gardner approximately $100,000 in cash on behalf of Ecuadorian Line. (*Id.* T. 6,179).

the last payment to Montella for their share of the Concordia work in December 1977, and this payment of $7,500 covered a period extending until June 1978. (Castelo, T. 6039), (Overt Act 20, GX 536, T. 6036).[12]

During the course of the Concordia Line demands and the actual payments, Gardner and Colucci attempted to extort additional payments from Quin to permit Quin to retain its Chilean Line account, which had also recently moved to Newark. (Overt Act 9, Count 13), (GX 417, T. 3944). Gardner and Colucci stated that "the boss" wanted more money, and Gardner indicated that "T is the boss." (*Id.*, T. 3390).

When Quin could not meet the demanded price, it lost the Chilean Line account. (*Id.*, T. 3391). This episode was not only an example of how Gardner and Colucci systematically advanced the interests of the RICO enterprise, but it was also evidence of the fact that anyone who wanted to do business in Port Newark had to cooperate with a system of tribute controlled by "T," i. e., Tino Fiumara.

In December 1975, after problems arose from duplicate demands made by Gardner and then again by Colucci with respect to the monthly Concordia Line payments (Montella dubbed this practice "double-banging"), Montella went to see Clemente at the Shelton Health Club. (Overt Act 10), (Montella, T. 3397–98). Clemente intervened, as set forth below, demonstrating that his influence and control extended into New Jersey, and demonstrating the nexus between the East Side sector of the enterprise he controlled and the New Jersey sector of the enterprise headed by Tino Fiumara, who controlled Buzzanca, Colucci, Gardner and Copolla.

When Montella told Clemente about his difficulties with Gardner and Colucci, he indicated that if he had seen him first, he would not have had to pay anyone. (*Id.*, T. 3397–98). Clemente directed that Montella see Thomas Buzzanca. (*Id.*, T. 3397–98). Subsequently, before a prearranged appointment was set up, Montella saw Clemente and Buzzanca by chance at Ponte's

Restaurant. Clemente told Buzzanca, "This is the kid I was telling you about." (*Id.*, T. 3399). Montella informed Buzzanca of his problems concerning Concordia, and Buzzanca told Clemente: "Mike, I'm sorry. I didn't know the kid was a friend of yours." (*Id.*, T. 3400). Buzzanca instructed Montella that Quin's monthly $2,000 payments should thereafter go to him instead of to Gardner and Colucci. (Overt Act 11), (Montella, T. 3400). He further told Montella that if Gardner and Colucci called again, he should just tell them that he was not going to see them anymore. (*Id.*, T. 3401). When Gardner and Colucci called the following month, Montella stated that he was not to see them; he never again received a phone call from Gardner or Colucci regarding the Concordia Line payments. (*Id.*, T. 3418; GX 414, T. 3887).

In January 1976, Montella went to Buzzanca's union office at Local 1804, 1804–1. He proceeded to explain to Buzzanca his difficulties in dealing with Gardner and Colucci. Buzzanca brought Fiumara into the room and asked Montella to repeat the story of his difficulties with respect to the Concordia Line payments. (*Id.*, T. 3406). At this January 1976 meeting, not in Fiumara's presence, Montella gave Buzzanca $2,000 in cash in a white envelope for the Concordia Line account. (*Id.*, T. 3408). Thereafter, Montella continued to see Buzzanca, and would usually meet him at the union office or at Ponte's Restaurant to deliver the monthly cash payment of $2,000. (*Id.*, T. 3412). Buzzanca, in turn, would deliver the monthly payment to Fiumara. (*Id.*, T. 3426, GX 414, T. 3887).

On several occasions, Michael Copolla, Fiumara's constant companion, agent and chauffeur, who was often photographed with Fiumara by F.B.I agents, was in contact with Montella or Buzzanca to arrange the payments or to pick up the money himself from Montella. (Montella, T. 3419–22), (Overt Act 15, November 18, 1977, GX 525, T. 3506), (Overt Act 16, November 21, 1977, GX 526, 527, T. 3509), (Overt Act 34, July

---

12. For the purposes of this opinion, the GX prefix refers to tape recordings.

11, 1978, T. 3744, 3745). On at least one occasion, Larry Ricci, an associate of Tino Fiumara, picked up the money from Montella. (Montella, T. 3422–25); *see also* (Overt Act 30, GX 657, T. 3717). Montella made the monthly Concordia Line payments through December 1978. (Montella, T. 3426). He continued to pay because he feared that if he did not do so, Quin would lose the account. (*Id.*, T. 3431). These Concordia Line payments were alleged in Counts 14 through 48 as extortion payments, and in Counts 49 through 83 as labor payments.[13]

During this period, defendant Clemente, though not occupying an official union position, exercised influence over officials of the ILA. He spoke about his own power on the waterfront, about his dealings with Scotto, ILA President Thomas Gleason, and General Organizer Fred Field concerning business and union affairs, and Government investigations. (Overt Act 36, GX 401, T. 3749), (Overt Act 38, GX 403, T. 3777), (Overt Act 39, GX 404, T. 3825, 3833, 3840–41).

Clemente demonstrated his power when he directed that Buzzanca and George Barone, vice-president of the ILA, secure additional container repair business for Quin in Norfolk, Virginia. (Overt Act 25, Montella, T. 3267), (Overt Act 26, GX 570, Photographic Exhibits 834, 835, 836), (Overt Act 27, GX 604, T. 3687), (Overt Act 42, GX 406, T. 3848). Clemente told Montella that Barone and Buzzanca were securing the business for Quin as a favor to him, and that Montella should not pay Buzzanca and Barone until the extent of the work that had been obtained for Quin was known (Overt Act 36, GX 401, T. 3749). In conversations with Montella, Barone confirmed that he

had spoken and met with Clemente regarding Quin business (Overt Act 44, October 5, 1978, GX 407(2), T. 3850), that Clemente had complained to him that Quin was not getting enough work and that he had told Clemente of his work in Quin's behalf. (Overt Act 46, October 25, 1978, GX 410, T. 3870). Montella thanked Barone for his efforts (*Id.*) and Barone directed that he "see the kids for Christmas." (*Id.*) On December 12, 1978, Montella gave Buzzanca $1,000 and Buzzanca stated he would give half of this money to Barone. (Overt Act 51, GX 414, T. 3887).

While Clemente was exercising influence over various ILA officials, Fiumara directed and controlled many of the activities of Buzzanca, Gardner, Colucci, Copolla and Ricci, and they cooperated with him in furthering the enterprise. On May 25, 1977, for example, Ricci brought Gardner to meet with Fiumara and Copolla at the Bele Vita Restaurant in New Jersey. (Delaney, T. 8397–99). Before speaking with Gardner alone for an hour, Fiumara promised Delaney, an undercover agent, that he would make him the house trucker for various steamship lines in the Port of New York. (Delaney, T. 8416), (GX 693, T. 8420). Ten days later, on June 4, 1977, Copolla told Delaney of Fiumara's power over Irving Held's work in New Jersey and over the Old Grace Line Pier, the Ecuadorian Line pier. He explained how Fiumara cooperated with Held by reducing the labor force on the piers when Held so requested.[14] (Delaney, GX 694, T. 8430). Later that year, on November 29, 1977, Montella told his employer, Walter O'Hearn, how Colucci and Gardner took directions from Fiumara (GX 585, T. 5598).

---

**13.** Many of the payments alleged in Counts 14 through 48 and again in Counts 49 through 83 were corroborated by tape recordings. For the Court's opinion denying defendants' motions to suppress evidence obtained as a result of electronic surveillance, see *United States v. Clemente*, 482 F.Supp. 102 (S.D.N.Y.1979).

**14.** In a similar vein, Dennis Meenan, the President of Ecuadorian Line, testified that in January 1976, he wanted to eliminate the jobs of six

men who were working for him on the pier. After he sought Gardner's assistance, four jobs were eliminated, with a result of a savings of $120,000 per year for Ecuadorian Line. Meenan testified that thereafter he paid Gardner $2,500 a month and that sometimes the Castelos helped make the payments. Meenan further testified that after a while, the payments were changed to quarterly payments of $7,500 in cash. (Meenan, T. 6,228–32).

The intimacy among the defendants was reflected in a series of phone calls made by Larry Ricci on July 6, 1977 at Fiumara's request in which he spoke in code with some of the other defendants. In the first conversation, Ricci called ILA, 1804 and his voice was recognized without introduction by Buzzanca. (GX 686, T. 8393). Ricci asked for "Andy" [Granatelli], the code for Copolla, and Buzzanca informed him that he was at Ponte's. Ricci then called Ponte's, asked for Mr. Granatelli, whereupon Copolla came to the phone. (GX 687, T. 8393). Copolla told Ricci to call "the Cong," and Ricci indicated that he would "get in touch with the Vietnamese guy," a word play on Vincent Colucci's initials, and would call Copolla after this conversation. Ricci then spoke with Colucci (GX 688, T. 8393) and reported back to Copolla about this conversation (GX 689, T. 8394).

The events of Spring 1978 provide further evidence of the nature of the relationship among the defendants. Thus, on April 3, 1978, in a conversation in the office of Local 1804, both Colucci and Buzzanca expressed concern about the impact of possible indictments:

Buzzanca: . . . "They will take everybody . . ."

Colucci: "Get everybody, that is right. What we need is more . . . stool pigeons, take us all . . . We will be all right. We will put a gag on Sullivan . . ." (GX 617, T. 6363).

Ten days later, on April 13, 1978, Fiumara's control of Buzzanca, Colucci, Gardner and Copolla was demonstrated when either by direct conversation with Buzzanca or by giving instructions to Buzzanca through Copolla, Fiumara set up meetings with Colucci and Gardner. (GX 624, 625, T. 7676–78). (See also GX 630, T. 7683, conversation on April 13, 1978 between Buzzanca, Barone and Gardner).

Throughout this period, Fiumara, like Clemente, met and spoke with Buzzanca frequently about waterfront business. On June 5, 1978, for example, Fiumara called Buzzanca and told him to keep an individual at work on a particular waterfront job.

(Overt Act 32, GX 663, T. 6368). On June 6, 1978, Fiumara warned Buzzanca that he was being followed. (Overt Act 33, GX 666, T. 6369). On September 22, 1978, Fiumara and Buzzanca met at a Holiday Inn, Jersey City, New Jersey (Overt Act 41, GX 405, Agent Kosakowski, T. 2973). See also Overt Act 23 (GX 557, T. 3577), Overt Act 24 (Montella, T. 3578–79), Overt Act 30 (GX 657, T. 3717), Overt Act 37 (GX 402, T. 3761), Overt Act 49 (Grover and Edwards, T. 7085–93, T. 7950–63).

The extent and nature of Fiumara's power was described by Gardner on December 22, 1978, when he met Montella and accepted $1,000, alleged as Count 85. During this recorded conversation, Gardner explained that he owed his allegiance to Fiumara and stated that he knew that Fiumara had been seeing Montella. (Overt Act 53, Count 85), (GX 417, T. 3944). He also acknowledged Montella's problems in 1975 regarding the payment of money to Colucci and Gardner for the Concordia Line account. With respect to getting new business for Quin in New Jersey, he stated:

"Remember one thing. . . . I don't make no move until I, ya know, check with. I do the right thing . . . I don't have the last decision."

\* \* \* \* \* \*

"I guarantee you whatever I can do to help you I'll do it. . . . we not only have the Barber Line comin in. Ya got a couple more comin in."

\* \* \* \* \* \*

"Let me know when you wanna sit down and we'll, I'll sit down. In fact, I'll mention it to T [Fiumara]. He's gonna manage."

\* \* \* \* \* \*

". . . I love him [Fiumara] cause he helped me when other people is trying to [expletive deleted] me around. And he came in. I laid it on the line and he, he opened the door for me."

\* \* \* \* \* \*

"I'm very loyal to this guy."

\* \* \* \* \* \*

"I can sit down and talk to him like I'm talkin' to you and say now give it to Sonny. Whatever ya want me to do I'm there."

> \* \* \* \* \* \*

"You want some of the action? See him. Then tell him . . . T, should I give something to Junior or whatever? Do what he says . . . I'll meet with him."

(GX 417, T. 3944).

In a similar vein, on December 12, 1978, in the course of talking about the way business is distributed on the waterfront, Buzzanca spoke about the source of Fiumara's power:

> "Tino's good points is that everybody fears and respects him. That's a good thing. He has blind devotion. I mean if . . . he's with you . . . he'll die with ya."

> \* \* \* \* \* \*

> "I love Tino and I would do anything in the world. . . ."

> "I live with him every day. I absolutely think, if this guy tempers himself, he'll be, ten years from now, he'll be awesome. . . . He'll have the best of two worlds. Good sense, good judgment, plus, which we all live under, fear. Ya need to have that balance. . . . We'll make money. We'll steal, if we have to. But listen to this guy."

> \* \* \* \* \* \*

> "Somehow I get in fact, I notice in Tino and more than Mike. I come from the greatest guy in the world."

(Overt Act 51, Count 84, GX 414, T. 3887).

In sum, the evidence showed that Clemente and Fiumara acted together in order to promote the interests of the enterprise "to corruptly control and influence" the waterfront. Besides the events of December 1975 and January 1976, which demonstrated the Clemente-Fiumara partnership, Clemente's actions on November 29, 1977 provide further evidence of the interrelationship among the defendants. On that date, after obtaining a document from the Waterfront Commission indicating that the Waterfront Commission may have learned of various payments made by Quin to Buzzanca, Gardner, Colucci and others (Overt Act 17), (Montella, T. 3513, T. 3541), (GX 414, T. 3887) Clemente met with Montella and Anthony Scotto in order to determine whether the Commission had an informant. (Overt Act 18), (Montella, T. 3543–46), (Orell, T. 7226).

On November 21, 1978, Clemente told Montella that he had met with Buzzanca and Fiumara and arranged for Fiumara to obtain additional business for Quin in Edgewater, New Jersey. (Overt Act 47, GX 411, T. 3870–72). Clemente informed Montella that "Tino give me some satisfaction," that Tino had stated, "Mike, there's somethin' comin'." During the conversation of November 21, Clemente related that he had told Buzzanca that Montella was not doing as well as he had expected, and that Buzzanca in turn responded that Barone wanted to speak with him. In the course of this conversation, Clemente spoke about the selection of the General Organizer of the ILA and Anthony Scotto, stating that "[o]nce he gets indicted, everybody else will get indicted."

On the following day, November 22, 1978, Montella met Buzzanca at Local 1804 and made a monthly payment of $2,000 to him. At this meeting, Buzzanca stated that Fiumara had told Clemente that there was a possibility of additional business for Quin in Edgewater, New Jersey. (Overt Act 48, GX 412, T. 3875). During the course of the conversation, Buzzanca indicated that he would be meeting with George Barone. Subsequent to this conversation, Buzzanca drove from Local 1804 to Cassella's Restaurant, Hoboken, New Jersey, where he met Fiumara and Copolla. (Overt Act 49, Agent Edwards, T. 7085–93; Agent Grover, T. 7950–63).

On December 8, 1978, Montella and Clemente met again at the Shelton Health Club and made a cash payment of $1,000. During the course of their conversation, Clemente asked Montella whether he had seen

"Tino," and stated that "[w]hen I met with him [Fiumara], he says there's somethin' comin up, Mike, and if it comes through he says I can help Sonny [Montella's nickname] in." Clemente also told Montella that he had instructed Buzzanca to tell Barone to get more business for Quin. (Overt Act 50, GX 413, T. 3879).

Five days after this conversation with Clemente, Montella met Buzzanca at Ponte's Restaurant. At that December 12th meeting, Buzzanca told Montella that he had met Fiumara the day before, and that Fiumara was asking for Montella. At the meeting, Montella arranged with Buzzanca to see Fiumara the following week. (Overt Act 51, GX 414, T. 3887).

When Montella met Buzzanca and Fiumara at Ponte's on December 21, 1978, Fiumara asked: "Where's Mike [Clemente]? I thought he'd be here?" Montella told Fiumara that Clemente had told him to talk with him. Montella stated, "He said that ya had something comin up in Jersey, Weehawken or Edgewater or something along . . . ." Fiumara responded, "Yes." After Montella made a payment to Fiumara, Fiumara told Montella that with respect to the new business in New Jersey, "We have a couple of other friends that are involved there also. But I already put it on record that you got the first shot. Nobody else." (Overt Act 52, GX 415, T. 3919, 3920).

### C. *Discussion*

We will now return to defendants' misjoinder contentions with respect to the various counts in light of the evidence discussed above.

*Counts 1 and 2*

With respect to Counts 1 and 2, the evidence adduced by the Government at trial showed that the defendants named in those counts were employed by and associated with an enterprise whose objective was to corruptly control and influence the waterfront industry in the Port of New York and other ports in the Eastern United States and to enrich themselves and their associates. The evidence further demonstrated that the defendants conducted the affairs of the enterprise through their control and influence over various unions and corporations, and that they enriched themselves by using this control and influence collectively and individually to distribute work and contracts to selected companies and associates from whom the defendants demanded and received tribute and payoffs. Moreover, the evidence showed that the individual members of the enterprise recognized each other's control and influence within their respective territories within the Port of New York and elsewhere, and used their positions to their individual benefit and to the mutual benefit of the members of the enterprise.

■ In short, the evidence showed that the defendants conducted and participated in an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962, and that such conduct constituted participation "in the same act or transactions or in the same series of acts or transactions constituting an offense or offenses." Rule 8(b), F.R.Crim.P. Hence, joinder of the defendants named in Count 1 was proper. The Court further found that the evidence adduced at trial showed that the acts proved were part of a single conspiracy with a common purpose, that is, the conspiracy charged in Count 2. *United States v. Stanchich*, 550 F.2d 1294, 1299 (2d Cir. 1977); *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972); *United States v. Gleason*, 616 F.2d 2, 16 (2d Cir. 1979).

■ The defendants have advanced the recent case of *United States v. Cryan*, 490 F.Supp. 1234 (D.N.J. 1980) in support of their contention that this Court erred on the severance issue with respect to Counts 1 and 2 in that those counts are defective because they charge and the Government proved two unconnected conspiracies. Count 1 of the *Cryan* indictment alleged that all four of the named defendants "conspired to conduct the affairs of an enterprise, the Essex County Sheriff's Office, through a pattern of bribery and extortion in violation of Title 18, United States Code, Section 1962(d)." Count 2 charged the

same defendants with violating one of the substantive provisions of RICO, Title 18, U.S.C. Section 1961(c). In *Cryan*, the district judge dismissed the first two counts of the indictment on the ground that the Government's theory was legally defective because certain evidence ("the Lerner transaction") charged in Counts 1 and 2 against all of the defendants was admissible against only one of them and because "no reasonable juror could conclude, beyond a reasonable doubt," that the transaction was part of the conspiracy alleged in Count 1. At 1244. It is clear that *Cryan* is distinguishable from *Clemente* for two primary reasons: First, unlike the district court in *Cryan*, this Court has concluded that the facts before us supported a finding of a single conspiracy.[15] Second, as the district judge noted, in the indictment before him, the alleged "enterprise" was an otherwise legitimate entity, the Sheriff's Office, and was not a "criminal association" or illegitimate entity, as was alleged in *United States v. Elliot*, 571 F.2d 880 (5th Cir.), *cert. denied* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) or in the instant indictment. In *Cryan*, the Government contended that anything relating to the Sheriff's Office was ipso facto a part of the conspiracy—a contention that the district court found to be untenable.

*Counts 3 through 142*

■ As noted, Counts 3 through 142 charged illegal labor payments and extortion or attempted extortion. At trial, the Government showed that these payments were part of the pattern of racketeering activity alleged in Count 1 and also constituted acts in furtherance of the conspiracy charged in Count 2. Since Rule 8(b) has been consistently construed to permit joinder of crimes arising out of a common scheme or plan, *United States v. Weisman and Cannatella*, 624 F.2d 1118, 1129 (2d Cir. 1980); *United States v. Ricco*, 549 F.2d 264, 271 (2d Cir.), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977), the Court

concluded that joinder of Counts 3 through 142 was proper.

*The Tax Counts and False Declaration Counts*

■ The evidence at trial revealed that the unreported income which underlay the tax charges represented the proceeds of the criminal activity involved in the other offenses in the indictment. Hence, joinder of defendants and counts was proper under both Rule 8(a) and Rule 8(b). *United States v. McGrath*, 558 F.2d 1102 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Isaacs, supra* 493 F.2d at 1158–59.

■ Similarly, the indictment's false declaration charges against Swanton were properly joined to the substantive offenses because those substantive counts clearly related to and were the subject of the questions involved in the false declaration charges. *United States v. Sweig*, 441 F.2d 114 (2d Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971) (Rule 8(a)); *United States v. Isaacs, supra*, 493 F.2d at 1159 (Rule 8(b)).

III. RULE 14

At the pre-trial stage, defendants moved for severance under Rule 14, F.R.Crim.P. Rule 14 provides in pertinent part:

"Relief From Prejudicial Joinder

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

Based upon the Government's offer of proof, the motions were denied without prejudice to renewal. Defendants renewed their motions at trial and the Court again denied them.

■ Severance was refused for a variety of reasons. As a general rule, absent sub-

---

**15.** At the request of the defendants, the Court charged the jury on multiple conspiracies. (T. 12,616–18). No exception was taken to the multiple conspiracy charge.

stantial prejudice to the accused, persons properly joined under Rule 8 should be jointly tried to "[conserve] judicial resources, [alleviate] the burdens on citizens serving as jurors, and [to avoid] the necessity of having witnesses reiterate testimony in a series of trials." *United States v. Lyles*, 593 F.2d 182, 191 (2d Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979), quoting *United States v. Borelli*, 435 F.2d 500, 502 (2d Cir. 1970), *cert. denied* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971). See *United States v. Werner*, 620 F.2d 922 (2d Cir. 1980). This policy favoring joint trials is particularly strong where, as here, "the crime[s] charged involve[d] a common scheme or plan . . . ." *United States v. Girard*, 601 F.2d 69, 72 (2d Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).

▮▮▮ The evidence offered at trial was not of unconnected defendants or such proof as would "[fan] the flames of prejudicial spillover." *United States v. Cambindo Valencia*, 609 F.2d 603, 629 (2d Cir. 1979). As the Government had represented, the evidence offered at trial showed important involvement by all the defendants in the crimes alleged in the indictment. The evidence established that there was no merit to the claims of Colucci, Copolla and Swanton that they were merely peripheral defendants. *United States v. Kelly*, 349 F.2d 720 (2d Cir.), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1965). As noted above, the evidence demonstrated Copolla's active involvement as Fiumara's associate and agent and his links to Buzzanca, Colucci and Gardner. With respect to Colucci, the tape recorded conversations of 1977 and 1978 showed that, notwithstanding his contentions to the contrary, his involvement in the enterprise extended well beyond his important activities of 1975.[16] With respect to Swanton, who was an unindicted co-conspirator in Count 2, the evidence showed that he played a critical role at the inception of the conspiracy in establishing a link between Clemente and Montella.

Finally, the Court notes the standard for determining whether a defendant is entitled to a severance that was articulated in *United States v. Kahaner*, 203 F.Supp. 78, 81–82 (S.D.N.Y.1962), *aff'd* 317 F.2d 459 (2d Cir.), *cert. denied sub nom. Corallo v. United States*, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963):

"The ultimate question is whether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted."

See also *United States v. Rucker*, 586 F.2d 899, 900–901 (2d Cir. 1978).

Guided by this principle, the Court concluded that the rights of the defendants could be safeguarded and that they would not be prejudiced by joinder. Throughout the trial, and in the charge, admonitory and limiting evidentiary instructions were given

---

**16.** Defendant Colucci, who was Gardner's close associate and was so identified by Gardner (Gardner, T. 9,109), bases his motions for severance and mistrial largely on the ground that in light of this alleged relationship, he was particularly susceptible to spillover prejudice. We do not deal here with a claim of antagonistic defenses. If Colucci was prejudiced because a jury might find incredible Gardner's explanation for his failure to file income tax returns and his other justifications for blatant criminal conduct, it is not such a prejudice as entitles a defendant to a mistrial or severance. No conspirator is entitled to be assured of a trial at which his co-conspirator will either present no defense or will present only a successful and convincing explanation of his alleged misdeeds. The evidence showed a close working relationship between Gardner and Colucci. It was outside the courtroom over the years and in furtherance of the criminal conspiracy that Colucci chose or agreed to entertain a close association with Gardner. This is not "guilt by association." The evidence demonstrated that Colucci and Gardner functioned as a team in their extortionate activities and Taft-Hartley violations and the Government was therefore entitled to try them together.

when appropriate. That the jurors heeded these instructions and appraised the evidence against each defendant "solely upon that defendant's own acts, statements and conduct," was demonstrated by the jurors' careful jury deliberations over a four-day period. A study of the notes from the jurors and their requests for specific testimony and exhibits reflects that they were engaged in a precise, logical analysis of the evidence with respect to each defendant and each count. For example, a discrepancy existed in the testimony of William Montella with respect to whether a transaction involving Copolla had been taped. In fact, electronic surveillance had ended prior to this occurrence. It was clear from the jury's detailed, specific requests [17] that they had focused on this discrepancy and that it gave them concern. Indeed, the jury was unable to reach a verdict on the counts (1, 36, 43, 71, 78) with respect to which the discrepancy was material.

This is hardly the picture of a confused jury, unable to follow or comprehend the evidence and separate defendants and counts. Rather it is the picture of a jury, painstakingly selected, conscientiously engaged in precisely the type of dispassionate, detailed consideration of the evidence which a jury trial contemplates and to which all participants in the trial are entitled. The conduct of the jury is itself the most persuasive negation of defendants' contentions that joinder deprived them of a fair trial.

## IV. GEANEY FINDING

▮ It is well established that before a court may permit a jury to consider against a defendant the out-of-court declarations of a co-conspirator as statements in furtherance of the conspiracy, pursuant to Rule 801(d)(2)(E), F.R. of Evid., the court must first find that "a fair preponderance of the evidence independent of the hearsay utterances" establishes the defendant's and the declarant's participation in that conspiracy. *United States v. Geaney*, 417 F.2d

1116, 1120 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *United States v. Cambindo Valencia*, 609 F.2d 603, 630–31 (2d Cir. 1979). In arriving at this determination, the district court must view the totality of the evidence rather than consider individual facts in isolation. *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977). Guided by these principles and pursuant to the test set forth in *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979), the Court made the following finding at the close of the Government's direct case based on admissions in tape recorded conversations, the testimony at trial, and other independent evidence. *United States v. Weisman and Cannatella*, 624 F.2d 1118, 1130 (2d Cir. 1980):

"(1), the Court finds there is sufficient independent non-hearsay evidence to establish the following:

(a) that a conspiracy existed;

(b) that the conspiracy was still in existence at the time the statements offered in evidence were made;

(c) that the offered declarations were made in furtherance of the conspiracy;

(d) that both the declarant and the defendant against whom the evidence is offered participated in the conspiracy;

(e) that the conspirators included all of the defendants in any capacity named in this indictment, George Barone, Larry Ricci, Joseph and Manuel Castelo [Dennis] Meenan and William Montella;

(f) that the conspiracy to which the declarant and the defendant against whom the evidence is offered is the conspiracy charged in the indictment, *U. S. v. [Cambindo] Valencia;*

(g) the Court further finds that insofar as evidence has been admitted against the defendant Swanton, that evidence has been relevant to perjury and aiding and abetting charges contained in the indictment with respect to Mr. Swanton." [18] (T. 8676–87)

---

**17.** (T. 12,892, 12,918).

**18.** As noted, defendant Swanton was named in extortion Counts 87 through 142 and false declaration Counts 143 through 146. He was also

The summary of evidence set forth *supra* demonstrates the basis upon which this finding was made.

## V. NETUMAR PAYMENTS

The defendants contend that the Court erred in permitting testimony by Mattmann and Gainsbury with respect to payments they made to Clemente. These "Netumar payments," noted above,[19] were alleged in Paragraph 10 of Count 1, the RICO count.

 The evidence was admitted on two grounds. First, the evidence was relevant to the issue of whether Clemente, who lacked official status on the waterfront and stressed that fact during the trial, exercised the position and power in the RICO enterprise alleged in Count 1, and whether it was reasonable for Montella to fear that he was in a position to harm him.[20] *United States v. Tolub*, 309 F.2d 286, 288–89 (2d Cir. 1962); *United States v. Tropiano*, 418 F.2d 1069, 1070 (2d Cir. 1969), *cert. denied* 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970). Second, the evidence of the Netu-

mar payments was relevant to a consideration of the tax counts in which Clemente was charged.

In the charge, as at trial (T. 1795–97), the jury was instructed as to the limited purposes for which it could consider the Netumar payment evidence:

"[Y]ou will recall that I read you paragraph 10 of Count 1, the RICO count, and that the indictment therein alleges that the defendant Clemente did obtain property from Netumar Line, to wit, more than $1 million, consisting of yearly payments of $175,000 to $200,000 from at least 1973 through and including 1978 in order for Netumar Line to obtain certain economic benefits in connection with the operation of Pier 36, Manhattan.

"You will also recall that Mr. Mattmann, the president of Netumar International, and Mr. Gainsbury, the owner or one of the three owners of the Netumar Line, testified as to making payments to Clemente and to the nature and circumstances of their relationship with Clemente.

an unindicted co-conspirator. Throughout the trial and in the charge (T. 12,688), the jury was instructed that it was permitted to consider with respect to Swanton only such evidence as was relevant to the counts in which he was named.

**19.** *See* pages 1317–1318 *supra*.

**20.** "MR. DEVORKIN: Yes. Our position was that the proof is relevant to show Mr. Clemente's power and control, and therefore, his position in the RICO enterprise or the RICO conspiracy. We think that his ability to strike up the relationship that he did with Netumar in effect changed things on the pier or with respect to labor or with respect to the stevedore there. One shows his actual power, his actual influence. Therefore, that is supportive of our claim in the RICO enterprise that he has the position in the enterprise that we claim he has.

"He has the position of power and influence that gives him the status in the RICO enterprise that we allege he has. It helps explain a number of things. It helps explain if you believe that it supports his status and position in the enterprise, to establish his status and position in the enterprise, it helps establish why other defendants—

"THE COURT: What power he in fact has in the waterfront is clearly relevant since he lacks official status. It is relevant to show

that he is in fact a person of a very great power and influence on those piers.

"If the Netumar payments are not extortionate payments, are they relevant only for the purpose of showing the power that he in fact exerts?

"MR. DEVORKIN: I think that what flows from that is that it is evidence supporting the allegation in Counts 1 and 2 that he has the position in the enterprise that we contend he does and if he has that position, that supports the contentions in those two counts that, A, other defendants named in those counts respect that position, act accordingly to high status and position and follow his instructions and requests because of that status and position; and secondly, that it shows that Montella was right in believing that Clemente was who he was led by Swanton and Clemente himself to believe he was, that Montella was right that Clemente had the power he thought he had with respect to those piers, with respect to that steamship line and he had the power to take business or give business to Montella.

"It also supports not just the fact that Montella was right that he had the power but it supports his subjective belief that he thought Clemente had the power."
(T. 1,764–66).

"Let me emphasize again that other than with respect to Counts 147 through 156, which charge that Clemente failed to report these alleged payments from Netumar on his income tax return for 1973 to 1977 and, therefore, evaded taxes on this income, the government does not contend that for purposes of this case the payments allegedly made by Netumar officials to the defendant Clemente were otherwise illegal.

"The government contends that evidence of these payments and the circumstances pursuant to which the payments were made by the Netumar officials to Clemente, are relevant to the contention that Clemente in fact exercised power and influence in matters with respect to the waterfront.

"It is the government's contention that Clemente was a person of power and influence on the waterfront and that the evidence with respect to the payments made by Netumar officials to Clemente and the facts and circumstances surrounding those payments are relevant to show that he did or did not in fact have such influence.

"It is solely for the purpose of showing power and control on the waterfront, and for the purpose of the tax counts, which I will deal with later, that the payments by Netumar officials to Clemente were offered by the government in evidence and were received." (T. 12,684–86)

## VI. THE COFFEE SWEEPS TRANSACTIONS

The defendants contend that the Court erred in permitting the admission into evidence of the so-called "coffee sweeps" transactions.

During the cross-examination of defendant Swanton and as part of the Government's rebuttal case, the Government was permitted to introduce evidence that from approximately 1970 through the time he left Netumar in 1974, Swanton demanded and received money from Coffee Holding Company, a company that purchased "coffee sweeps" from Netumar for resale,[21] in return for permitting that company to continue doing that business. Swanton told Sterling Gordon, the owner of Coffee Holding, that his company could not continue doing business with Netumar unless Gordon paid Swanton personally. (Gordon, T. 10,-647–8). Swanton devised a scheme for Gordon to make these payments through a third party named Thomas Dowd. Gordon agreed to this arrangement because he believed that Swanton would have his company replaced if he failed to cooperate. (*Id.* at 10,650). After the payments began, Gordon agreed to increase the payments after Swanton had informed him that unless he did so, the coffee sweep business would be given to another company. (*Id.* at 10,652).

The Government initially sought to introduce the "coffee sweeps" evidence in its direct case, arguing that Swanton's demand and receipt of money from Gordon was admissible as proof that he made false declarations before the grand jury when he denied that he had ever received "a nickel" on the waterfront.

 In an oral opinion, the Court noted that the coffee sweep evidence did not grow out of the underlying substantive offenses charged in the indictment; thus, the Government's application to introduce the evidence on its direct case was denied. (T. 6,863–65). The Court specifically indicated, however, that its ruling "dealt only with the question of the introduction of . . . [the coffee sweep] evidence for the purposes indicated by the Government as part of the Government's direct case." (T. 6,865)[22]

---

21. "Coffee sweeps" are coffee beans that have been spilled in the loading or discharging of coffee on the pier, or as a result of the breakage of bags on the pier, and are rebagged and collected. (T. 10,449, 10,611, 10,639).

22. In that same opinion, the Court ruled that under *United States v. Corr*, 543 F.2d 1042, 1049 (2d Cir. 1976), a false statement may constitute a "false material statement," 18 U.S.C. 1623(a), even if it is volunteered and not responsive to a particular question. For the Court's opinion on the materiality of Swanton's declarations, see T. 8,516–8,521.

After the Government had completed its direct case, and after it became certain that defendant Swanton would indeed testify on his own behalf, the Court initiated a robing room conference in order to establish the permissible scope of cross-examination and introduction of evidence with respect to the coffee sweeps evidence. (T. 9,876). At this conference, the Government advanced three bases for admission of the evidence, contending that (1) it was independent proof of the false declaration counts, (2) it was admissible on the extortion counts in which Swanton was charged because it was relevant to the issue of his power on the pier and his relationship to contractors on that pier, and (3) it was admissible with respect to Swanton's credibility pursuant to F.R. Evid. 608(b) as dishonest acts probative of his truthfulness or untruthfulness. (T. 9,886–87). The Court ruled, as it had done its previous opinion, that the coffee sweeps evidence was not admissible as independent proof of the false declaration counts. However, the Court ruled that the Government could cross-examine Swanton on the coffee sweeps transactions on the theory that since they constituted acts allegedly involving dishonesty and deception, they were relevant to Swanton's credibility. (T. 10,194). Moreover, the Court noted that by testifying, Swanton had put his credibility before the jury. (T. 9,894). The Court further stated that the coffee sweeps evidence was admissible with respect to the extortion counts in which Swanton was charged with aiding and abetting Clemente in the extortion of Montella. The Court indicated that it was an element of proof of the extortion that Swanton was "in fact a person who was in such a position and in such authority so that he could engender a reasonable fear of loss of the account and economic reprisal upon the part of those who dealt with Netumar." (T. 10,194).[23] See *United States v. Tolub*, 309 F.2d 286, 288–89 (2d Cir. 1962) ("That the fear must be a reasonable one is well established. . . . There was ample evidence from which the jury could find that Tolub was in a position to harm Bass-Feit, Inc. and that fear of such harm was reasonable."). *United States v. Tropiano*, 418 F.2d 1069, 1075 (2d Cir. 1969).

While the Court ruled prior to Swanton's direct testimony that it would permit cross-examination with respect to the coffee sweeps, it deferred until the completion of his direct testimony its decision as to whether the Government would be permitted on its rebuttal case to introduce extrinsic evidence of the coffee sweeps. (T. 9,895, 9,897). The Court observed that "exclusionary rules for the benefit of a defendant are not a license to lie." (T. 9,897). During his direct and the early stages of his cross-examination testimony, Swanton equivocated about the nature and extent of his influence and power on the waterfront. Consequently, the Court ruled that the Government could introduce extrinsic evidence of the coffee sweeps, while limiting the extent of that evidence.[24]

■ At trial, the jury was cautioned that the coffee sweeps testimony "is being offered and it is being received solely with respect to the defendant Swanton and is not being considered by you with respect to any other defendant."[25] (T. 10,503). In

---

**23.** "THE COURT: In order for the payments to have been extortion, in order for this jury to believe that the nature of the payments made by Montella in the first instance to Mr. Swanton and then after Mr. Swanton's departure to Mr. Clemente, if the jury believes Montella, . . . they will have to determine that it was reasonable for Montella to believe that Mr. Swanton in fact controlled what contractors would or would not service Netumar." (T. 10,468).

**24.** William Fiumara, James Ryan, Sterling Gordon and Charles Mattmann testified with respect to the coffee sweeps transactions. Coun-

sel for Swanton indicated that he could not raise any claim of surprise with respect to the Court's evidentiary ruling on the coffee sweeps evidence. (T. 10,473).

**25.** Although the Government argued that the coffee sweeps testimony was admissible against the other defendants insofar as it was evidence of the power, control and extortionate actions of Swanton, an unindicted co-conspirator (T. 10,478), the Government indicated that it would be "content" to offer the evidence only against Swanton. (T. 10,499).

The Court notes that although the coffee sweeps evidence was limited to Swanton, the

the charge, the jury was again instructed as to the limited purposes for which the coffee sweeps testimony could be considered:

"You may consider the coffee sweeps testimony only for the following purposes:

"First, the government has offered the coffee sweeps evidence, and this evidence has been received solely against the defendant Swanton. There is no contention that any other defendant was in any way involved in the coffee sweeps matter or that it was part of the conspiracy alleged in the indictment.

"In considering the coffee sweeps testimony, insofar as Swanton is concerned, you may give this evidence such weight as you deem appropriate in evaluating Mr. Swanton's credibility.

"You may also consider this evidence insofar as it relates to the position of power and authority which Mr. Swanton actually occupied at Netumar.

"You may give the coffee sweeps testimony such weight and consideration as you deem appropriate in determining whether Swanton in fact occupied such position of authority and control at Netumar, and on the waterfront, as to enable him to cause Montella to reasonably fear that New Jersey Export would lose the Netumar account if he failed to comply with Swanton's direction.

"There is, of course, no evidence that Montella knew about the coffee sweeps matter.

"Montella testified that Swanton had told him that he threw ITO [a stevedoring company] off the pier and as to his general belief as to Swanton's power and authority.

"But no claim is made that Montella had any knowledge of the Coffee Holding matter.

"It is, therefore, only relevant to the government's contentions as to Mr. Swanton's actual power and authority and the

manner in which he was able to and in fact utilized the government contends, such power and authority for the purposes of extortion." (T. 12,646–67).

The jury was further instructed that it could not consider the coffee sweeps testimony as independent proof with respect to the false declaration counts:

"You will recall my discussion of the evidence concerning the alleged coffee sweeps transaction. I charge you that you may not convict Swanton on the false declaration counts solely on the basis of the coffee sweeps transaction.

"If you find that Swanton did not make false declarations in denying that he received money from Montella, but that he did receive money from Coffee Holding, then you must acquit Swanton on the false declaration counts." (T. 12,760).

## VII. MARSHALING OF EVIDENCE

The defendant Swanton desired that the Court marshal the evidence. Other defendants were of a contrary view. Given the volume of the evidence and the length of the seven defendant trial, marshaling of the evidence was clearly appropriate. *United States v. Kelly*, 349 F.2d 720, 758, (2d Cir.) *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1965).

The Court requested that counsel provide it with proposed summaries of the evidence for use in preparation of the section of the charge which was to deal with marshaling. With the exception of counsel for defendants Swanton and Copolla, this invitation was not accepted. Prior to a charge conference, the Court furnished all counsel with copies of its proposed marshaling of the evidence, and requested that any inaccuracies or desired modifications or additions be called to its attention. At the charge conference, the defendants proposed language dealing with their individual contentions, and these suggestions were embodied in the

other defendants contend that they were nevertheless subject to "prejudicial spillover." We do not find this Rule 14 argument persuasive, particularly in light of the fact that the coffee

sweeps payments emanated from a quite distinctive source; thus the coffee sweeps evidence could be easily segregated in the minds of the jurors.

charge. (T. 12,444–12,450). Counsel also advised the Court of any claimed inaccuracies. The Court indicated that any objections to the charge not specifically brought to its attention at the charge conference would be deemed waived. (T. 12,497).

■ The charge as finally delivered was a reflection of the process described above. (T. 12,634–12,703). Obviously, any brief summary of an eleven week trial will be subject to criticism as being, in some respects, too expansive or too abbreviated. It is the trial court's role to present to the jury a fair and reasonably concise summary of the evidence in a manner which will facilitate the jury's relation of the evidence to the issues and contentions and to promote the jury's individualized consideration of each defendant. The Court, of course, instructed the jury that it was its evaluation and recollection which controlled. (T. 12,521, 12,527, 12,634).

In the final analysis, perhaps the most persuasive answer to the arguments directed against marshaling the evidence and permitting the jurors to take notes was the jurors' deliberative process as reflected in the numerous requests for specifically identified exhibits.[26]

## VIII. REFERENCES TO ANTHONY SCOTTO

The defendants have objected to references to Anthony Scotto during the trial, particularly in various tape recordings. In advance of the trial, over a number of sessions, the Court and counsel engaged in the process of redacting from tapes and transcripts references on a variety of matters. (*See*, e. g., December 13, 1979, page 11). With respect to Mr. Scotto, a high ranking official of the ILA who was convicted on various Taft-Hartley, RICO, conspiracy, income tax evasion and fraud counts on November 19, 1979, *United States v. Scotto*, 79 Cr. 32 (CES) (S.D.N.Y.1979), the Court indicated that it would order the redaction of references which were extraneous or in the nature of gossip. (December 13, 1979, page

23). However, the Court also stated that it would not automatically order the redaction of any references to Scotto which were relevant to the issue of the power and influence of the defendants on the waterfront, to the structure of the ILA, or were essential to the meaning and context of a tape recording. (*Id.*, 21–24).

■ The Court observes that counsel were diligent and meticulous in their pursuit of selecting a fair and impartial jury. This juror selection process extended over an eight day period. We note that upon request of counsel, the Court in its voir dire made the following inquiry of potential jurors:

"Is there anything which you have heard or read about Anthony Scotto or his case which would make it difficult for you to be a fair and impartial juror in this case in which Mr. Scotto is not a defendant, but in which his name may come up?" (*See*, e. g., T. 521).

In short, it is clear that the juror selection process itself served to protect the defendants against any prejudice which could have resulted from references to Anthony Scotto.

## IX. DEFENDANT GARDNER'S MISCONDUCT

The defendants make the generalized claim that Carol Gardner's misconduct during the trial prejudiced them and entitled them to a declaration of a mistrial. Before elaborating upon the reasons that the motions for a mistrial were denied, the Court will briefly review the pertinent portions of the record.

On one occasion prior to his taking the stand, Gardner and some spectators, who were identified as members of his union or his supporters, had made audible comments in the courtroom. (T. 8,299, 8,301 8,379). Out of the presence of the jury, the Court cautioned and reprimanded Gardner. (T. 8,379–8,380). Gardner assured the Court that no such disturbances would occur in the future on the part of anyone he con-

---

**26.** *See* pages 1325–1326 *supra*.

trolled. Indeed, in this regard he volunteered that members of his family in attendance at the trial would conduct themselves with appropriate decorum. ( T. 8,380).[27]

Gardner was on the stand in his own defense for nearly three trial days. (T. 9,039 to 9,698).[28] He was a difficult, evasive and provocative witness. It was clear that Gardner, who had recently been convicted at a trial for Taft-Hartley violations[29] at which, he alleges, on advice of his attorney, he did not testify, had determined to testify at this trial despite contrary advice of counsel.

Gardner was the sole Black defendant. It would be fair to characterize his defense as being devoted almost exclusively to an appeal to what he perceived to be the racial sympathies of the predominantly Black jury. Thus, his explanation for his failure to file income tax returns for several years was that southern FBI agents were engaged in an effort to "frame" him because he opposed Governor George Wallace's appearance at an ILA convention. (T. 9,691–92). He asserted that the reason for meeting with Montella was to increase employment opportunities for Blacks. (T. 9,592). He missed no opportunity to make racial appeals. When Assistant United States Attorney Daniel Bookin asked him about the color of the piece of paper that he claimed was handed to him by Montella during their conversation on December 12, 1978, Gardner's response was "[t]he same as you . . . White." (T. 9,596). In short, Gardner himself fully developed from the witness stand his claim that the prosecution was the result of racial bias.[30]

At the conclusion of Gardner's examination on redirect, which marked the end of his testimony, a courtroom spectator, later identified as Gardner's son, stood in the rear of the courtroom and shouted an accusation that the chief Assistant United States Attorney in charge of the prosecution, Michael Devorkin, had used a racial epithet in conversation with the defendant. Gardner asked him to sit down and then broke into tears.[31] The jury was immedi-

---

**27.** Gardner represented to the Court: "I promise you that when my relatives, friends and members be in the courtroom they will act like normal people, like anybody else. That I promise you."

**28.** After Gardner's testimony was completed, several character witnesses testified on his behalf.

**29.** *United States v. Gardner*, 79 Cr. 227 (S.D.N.Y.1979) (LFM), Judge MacMahon, presiding.

**30.** Opening remarks made by counsel for Gardner appeared to suggest that the prosecution against Gardner by the Office of United States Attorney was racially motivated. In light of the serious consequences of such an accusation if proved baseless, *United States v. Gleason*, 616 F.2d 2, 27 (2d Cir. 1979), the Court asked counsel, outside the presence of the jury, if it was indeed his contention that the prosecution was racially motivated. (T. 1,629). He indicated that he did not intend to make such a charge. Counsel agreed with the Court's suggestion that clarifying remarks would be appropriate. Accordingly, after discussion with counsel, the Court made the following statement to the jury:

"Before we begin with presentation of the government's evidence, I would like to clarify one matter which deals with remarks that were made in the opening statements made on behalf of Carol Gardner.

"After conferring with counsel, I am authorized on behalf of Mr. Gardner and his counsel to advise you that no contention is being made that the United States Attorney's office or the Department of Justice, in initiating and prosecuting this action, was motivated by any hostility towards Carol Gardner because of his race or his status in the labor union.

"Let me say that again. No contention is being made on behalf of Carol Gardner that the United States Attorney's office or the Department of Justice in initiating or prosecuting this action was motivated by any hostility toward Carol Gardner because of his race or status in the labor movement." (T. 1,669)

**31.** The incident was transcribed as follows:

"A VOICE: And Devorkin told him that black mother [expletive deleted] liar.

"DEFENDANT GARDNER: Sit down.

"A VOICE: Dad, I can't.

"DEFENDANT GARDNER: Sit down. You will go in the hole.

"A VOICE: He is my father.

"THE COURT: Ladies and gentlemen, we will take a recess.

"A VOICE: Devorkin is a racist.

"DEFENDANT GARDNER: Go ahead outside." (T. 9,698)

At the colloquy which followed after the jury had left the courtroom, Gardner's son was excluded, without objection from any defendant, from further proceedings.

ately ushered from the courtroom. The entire episode took place and was concluded in a matter of moments. Various defense counsel volunteered their belief that the incident was unstaged and spontaneous. (T. 9,765). Motions for a mistrial were made at this time and were denied. (T. 9,764–65). The defendants specifically made it clear that they did not want the Court to give a cautionary instruction to the jury, and no such instruction was given. (T. 9,765).

The next Gardner "incident," also of fleeting duration, took place during Mr. Devorkin's rebuttal summation, when the defendant interrupted: "He's lying." The Court responded: "None of that. We will have order in the courtroom." (T. 12,367.) Mr. Devorkin continued his rebuttal without further interruption from Gardner. Again, no cautionary instruction was requested by the defendants.

The final Gardner "incident," also of a moment's duration, took place during jury deliberations, when the jury had asked to have some testimony read to it. At the conclusion of the reporter's reading of the transcript, Gardner blurted out: "I think the jury should be told about Mr. Devorkin lying." (T. 12,944). The Court responded: "Mr. Gardner, would you please be seated and be quiet. Be seated and be quiet, please." (T. 12,944). The jury was escorted from the courtroom and Gardner was admonished about his behavior. Again, no cautionary instructions were requested by counsel.

After this incident during jury deliberations, the Court considered whether Gardner should be excluded from the courtroom in the event that there were any further proceedings before the jury prior to verdict. However, the sole jury inquiry thereafter requested tax returns in evidence and a repetition of the Court's charge on Counts 1 and 2. (T. 12,949). This latter request was dealt with by sending into the jury room the transcript of this portion of the charge, a procedure to which no exception was taken. (T. 12,951). The jury returned its verdict without any further Gardner incidents.

Although a ground urged by Colucci in his motion to set aside the verdict was the alleged failure of the Court to act more stringently with regard to Gardner's misconduct, counsel for defendants have not come forward, even with the advantage of hindsight, with any suggestions as to how the Court should have dealt with the issue other than by the granting of severance or a mistrial.

As has been noted, Gardner, from the witness stand, made clear to the jury the nature of his defense. The jury learned nothing from the so-called incidents other than the fact that Gardner was hot-tempered and claimed that he was the victim of a vast conspiracy to discredit him because he was the "highest ranking Black labor official in the country" who would not tolerate racial discrimination.

■ The defendants have grossly exaggerated the significance of the Gardner incidents, which constituted but fleeting minutes in a trial of eleven weeks' duration. The jury's prime exposure to Gardner and to his contentions came from his testimony and the arguments of his counsel. His conduct approached but did not cross the line where he should have been excluded from the courtroom. It matters little whether the outburst of Gardner's son or his own tears were spontaneous or staged or whether they invoked sympathy or resentment on the part of the jury. What is significant is that neither Colucci nor any other defendant suffered any prejudice.

Had prejudice occurred, the Court would have faced more difficult questions. In light of the fact that the Court had denied severance on a number of occasions, a decision by the Court to grant severance because of Gardner's misconduct would have run the risk of "rewarding" or encouraging such conduct in the future. Such a ruling would hardly deter similar misconduct in future multi-defendant cases in which a defendant and his counsel may regard severance or retrial as their most important

objective. *See United States v. Marshall*, 458 F.2d 446, 451 (2d Cir. 1972) and cases cited therein; *see also United States v. Smith*, 578 F.2d 1227 (8th Cir. 1978). Suffice it to say that the Court is satisfied that the jury reached its verdict here solely on the basis of the properly admitted evidence, and heeded the general instructions in the charge as to what could and could not be considered as evidence.

Other motions by defendants have been denied for reasons fully set forth in the trial transcript or which warrant no further discussion.

So ordered.